UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------

NICHOLAS MERRILL,

                    Plaintiff,

      v.                                No. 14-cv-9763

ERIC HOLDER, Jr., in his official capacity as
Attorney General of the United States, and
JAMES B. COMEY, in his official capacity as
Director of the Federal Bureau of Investigation,

                    Defendants.

-----------------------------------------------------------

**BRIEF OF *AMICI CURIAE* THE REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS AND 21 MEDIA ORGANIZATIONS
IN SUPPORT OF PLAINTIFF**

Michael D. Steger
STEGER KRANE LLP
1601 Broadway, 12th Floor
New York, NY  10019
(212) 736-6800
*Counsel of record for amici curiae*

Bruce D. Brown
Katie Townsend
Hannah Bloch-Wehba
REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1250
Washington, D.C. 20005
(202) 795-9301
*Of counsel*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................... i

TABLE OF AUTHORITIES ................................................................................... iv

STATEMENT OF INTEREST ................................................................................ 1

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

    I.   The press and the public have a First Amendment right to receive information from a willing speaker. ......................................................................................... 2

    II.   The press and the public have a heightened interest in hearing from Plaintiff. .................. 4

    III.   The prior restraint at issue here prohibits speech on matters of substantial political and social importance. .............................................................................................. 7

        A.   The information Merrill seeks to distribute to the public about the types of communications records that the FBI requests using NSLs has significant constitutional and statutory implications. ........................................................................................ 7

        B.   NSLs, and the secrecy surrounding them, imperil the confidential relationship between reporters and sources. ..................................................................................... 10

            i.   The FBI has previously disregarded regulatory protections for the press by using informal requests to obtain news media records. ........................................................ 10

            ii.   The use of NSLs to obtain reporters' electronic communication transaction records puts confidentiality at risk. ................................................................................ 12

    CONCLUSION .................................................................................................. 14

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, and Local Rule 7.1.1, *amici* disclose that:

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit association of reporters and editors with no parent corporation and no stock.

American Society of News Editors is a private, non-stock corporation that has no parent.

Association of Alternative Newsmedia has no parent corporation and does not issue any stock.

Association of American Publishers, Inc. is a nonprofit organization that has no parent and issues no stock.

Courthouse News Service is a privately held corporation with no parent corporation and no publicly held corporation holds more than 10 percent of its stock.

Dow Jones is a Delaware corporation with its principal place of business in New York. News Corporation, a publicly held company, is the indirect parent corporation of Dow Jones. Ruby Newco, LLC, a subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. No publicly held company directly owns 10% or more of the stock of Dow Jones.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

The Investigative Reporting Workshop is a privately funded, nonprofit news organization affiliated with the American University School of Communication in Washington. It issues no stock.

The McClatchy Company is publicly traded on the New York Stock Exchange under the ticker symbol MNI. Contrarius Investment Management Limited owns 10% or more of the common stock of The McClatchy Company.

MediaNews Group, Inc. is a privately held company. No publicly-held company owns ten percent or more of its equity interests.

Media Consortium is a network of over 75 independent news outlets. Its parent organization is the Foundation for National Progress (FNP), a non-profit corporation that issues no stock. FNP has no parent company.

MPA – The Association of Magazine Media has no parent companies, and no publicly held company owns more than 10% of its stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

Newspaper Association of America is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

The News Guild – CWA is an unincorporated association. It has no parent and issues no stock.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

Reuters America LLC is an indirect, wholly owned subsidiary of Thomson Reuters Corporation, a publicly held company. No publicly held company owns 10% or more of the stock of Thomson Reuters Corporation.

The Seattle Times Company: The McClatchy Company owns 49.5% of the voting common stock and 70.6% of the nonvoting common stock of The Seattle Times Company.

Student Press Law Center is a 501(c)(3) not-for-profit corporation that has no parent and issues no stock.

The Tully Center for Free Speech is a subsidiary of Syracuse University.

WP Company LLC d/b/a The Washington Post is a wholly owned subsidiary of Nash Holdings LLC. Nash Holdings LLC is privately held and does not have any outstanding securities in the hands of the public.

## <u>TABLE OF AUTHORITIES</u>

CASES

*Branzburg v. Hayes*, 408 U.S. 665 (1972) ................................................................. 12

*De Jonge v. Oregon*, 299 U.S. 353 (1937) .................................................................. 8

*Doe v. Ashcroft*, 334 F. Supp. 471 (S.D.N.Y. 2004) .................................................. 14

*Garrison v. State of La.*, 379 U.S. 64 (1964) .......................................................... 5, 10

*Griswold v. Connecticut*, 381 U.S. 479 (1965) ........................................................... 4

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ............................................................... 3

*Lamont v. Postmaster General of United States*, 381 U.S. 301 (1965) .................... 4, 5

*Marcus v. Search Warrant*, 367 U.S. 717 (1961) ...................................................... 11

*Martin v. City of Struthers*, 319 U.S. 141 (1943) .................................................... 3, 4

*Mills v. Alabama*, 384 U.S. 214 (1966) ....................................................................... 8

*Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367 (1969). .................................................. 5

*Roth v. United States*, 354 U.S. 476 (1957) ................................................................. 6

*Stanford v. Texas*, 379 U.S. 476, 482 (1965) ............................................................. 10

*Stanley v. Georgia*, 394 U.S. 557 (1969) ..................................................................... 4

*United States v. Simon*, 664 F. Supp. 780 (S.D.N.Y. 1987) ..................................... 4, 5

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976). ........... 3

*Warshak v. United States*, 631 F.3d 266 (6th Cir. 2010) ............................................ 9

*Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16 (2d Cir. 1984) .................. 4

*Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976) ........................................ 4

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ........................................................ 11

STATUTES

42 U.S.C. § 2000aa ........................................................................................................ 9

OTHER AUTHORITIES

Comm. To Protect Journalists, *The Obama Administration and the Press: Leak Investigations and Surveillance in Post-9/11 America* (Oct. 10, 2013) ........................................ 15

Dep't of Justice, Office of the Inspector General, *A Review of the FBI's Use of NSLs: Assessment of Corrective Actions and Examination of NSL Usage in 2006* (Mar. 2008) ("NSL Report II") ............................................................................. 6, 8

Dep't of Justice, Office of the Inspector General, *A Review of the Federal Bureau of Investigation's Use of Exigent Letters and Other Informal Requests for Telephone Records* (Jan. 2010) ............................................................................................. 13

Dep't of Justice, *A Review of the FBI's Use of NSLs: Assessment of Progress in Implementing Recommendations and Examination of Use in 2007 through 2009* (Aug. 2014) ("NSL Report III"). ................................................................................... 6, 7, 9

iv

Nakashima, Ellen, *White House proposal would ease FBI access to records of Internet activity*, Wash. Post (July 29, 2010) ................................................................................. 8

Royce-Bartlett, Lindy, *Leak Probe Has Chilled Sources, AP Exec Says*, CNN (June 19, 2013). 15

S. Rep. No. 96–874 (1980). ..................................................................................... 11

Schuman, Jamie, *The Shadows of the Spooks*, The News Media and the Law, Fall 2013 .......... 16

Sherman, Mark, *Gov't Obtains Wide AP Phone Records in Probe*, Associated Press (May 13, 2013) ................................................................................................................. 14

Zalesin, Jeff, *AP Chief Points to Chilling Effect After Justice Investigation*, The Reporters Comm. for Freedom of the Press (June 19, 2013) .................................................. 15

**REGULATIONS**

28 C.F.R. § 50.10 ............................................................................................... 10, 11

## STATEMENT OF INTEREST OF *AMICI*

The Reporters Committee for Freedom of the Press, American Society of News Editors, Association of Alternative Newsmedia, Association of American Publishers, Inc., Courthouse News Service, Dow Jones & Company, Inc., First Amendment Coalition, Investigative Reporting Workshop at American University, The McClatchy Company, Media Consortium, MediaNews Group, Inc., National Press Photographers Association, Newspaper Association of America, The News Guild - CWA, Radio Television Digital News Association, The Seattle Times Company, Student Press Law Center, Tully Center for Free Speech, and The Washington Post (collectively, "*amici*") submit this brief with the consent of both parties to this matter. This brief was authored entirely by counsel for *amici*. No counsel for any party authored this brief in any part, nor did any party (or any person other than *amici* and their counsel) contribute money to fund its preparation or submission. *Amici* hereby incorporate by reference the statement of interest set forth in its unopposed motion for leave to file this brief as *amici curiae*.

## INTRODUCTION

This is the fourth time that plaintiff Nicholas Merrill ("Merrill" or "Plaintiff") has appeared before this Court regarding a National Security Letter ("NSL") issued to him by the Federal Bureau of Investigation ("FBI") in 2004. The overwhelming majority of NSLs—administrative subpoenas issued under the Electronic Communications Privacy Act ("ECPA")—are, like the one issued to Merrill, accompanied by nondisclosure requirements. And, after years of litigation and negotiation, and more than a decade after initially receiving the NSL at issue here, Merrill continues to be barred from speaking or writing about a critical feature of that NSL: the contents of its attachment identifying the types of "electronic communications transactional records" ("communications records") sought by the FBI. Merrill contends that this unending gag

order violates the First Amendment and has moved this Court for summary judgment in his favor.

*Amici* agree that the continued prohibition on Merrill's disclosure of the contents of the attachment is an unconstitutional content-based restriction and an impermissible prior restraint on his speech. *Amici* write separately to highlight for the Court the First Amendment right of the press and the public to receive the information that is the subject of the prior restraint at issue in this case and to emphasize that the contents of the attachment are a matter of substantial public importance. In addition, *amici* write to underscore the corrosive effect that compelled disclosure of individuals' communications records has upon the ability of the press to gather news and report on matters of public interest. Warrantless, secret acquisition of individuals' communications records damages the ability of journalists and reporters to safeguard the confidentiality of their sources and to pursue stories free from government interference, which, in turn, hampers the press's ability to fulfill its constitutionally recognized role in keeping the public informed.

## ARGUMENT

### I. The press and the public have a First Amendment right to receive information from a willing speaker.

Merrill asserts his First Amendment right to speak about the full extent of the NSL he received in February, 2004. *See* Compl. ¶ 6. Specifically, Merrill seeks to disclose to the public the categories of communications records sought by that NSL. *Id.* Yet it is not only Merrill's constitutional rights that are at stake in this litigation. The prior restraint on speech at issue here also infringes the independent First Amendment right of the press and the public to receive the information that Merrill seeks to disseminate.

2

"[W]here a speaker exists, as is the case here, the protection afforded [by the First Amendment] is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976).  In *Virginia State Board of Pharmacy*, the Supreme Court explained that this precept was "clear from the decided cases," *id.*, such as *Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972), where the Court referred to a broadly accepted right to "receive information and ideas," and *Martin v. City of Struthers*, 319 U.S. 141 (1943), where the Court wrote:

> The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance.  This freedom embraces the right to distribute literature, and necessarily protects the right to receive it.

319 U.S. at 143 (internal citations omitted).

The right to receive information is an independent "corollary" of the guarantees of free speech and a free press.  *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 76 (1976) (Powell, J., concurring).  "The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read . . . ."  *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965).  Likewise, "the right to gather and report news is encompassed within the protections afforded under the First Amendment."  *United States v. Simon*, 664 F. Supp. 780, 786 (S.D.N.Y. 1987).  Thus, while it is related to the speaker's First Amendment rights, the right of the press and the public to receive information from a willing speaker is "independent."  *Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, 22 (2d Cir. 1984).  And, as the Supreme Court stated in *Stanley v. Georgia*, "[t]his right to receive information and ideas, regardless of their social worth . . . is fundamental to our free society."  394 U.S. 557, 564 (1969) (internal citations omitted).

The "willing speaker" doctrine is usually invoked to establish that the press has standing to challenge an unconstitutional restraint on speech that purports to bind a third party.  *See, e.g.*, *United States v. Simon*, 664 F. Supp. 780, 786 (S.D.N.Y. 1987) ("[A] right to receive speech becomes cognizable only when an individual has indicated a willingness to speak and is being restrained from doing so.").  But the doctrine also demonstrates the inextricable connection between the First Amendment rights of the speaker and the related, independent rights of his or her audience.  Indeed, "[i]t would be a barren marketplace of ideas that had only sellers and no buyers."  *Lamont v. Postmaster General of United States*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring).  Accordingly, in the free marketplace of ideas, "the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences" is paramount.  *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 390 (1969).

II.    **The press and the public have a heightened interest in hearing from Plaintiff.**

A speaker's constitutionally protected interest in communicating with the public, and the public's corresponding constitutionally protected interest in receiving those communications are of the highest order where, as here, the communications concern government conduct.  *See Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.").

Merrill's disclosure of the categories of communications records sought by the FBI in the NSL issued to him is precisely this kind of communication.  It would inform public debate about government conduct—specifically the government's use of NSLs—and enable public oversight of the executive branch.  Speech of this kind lies at the core of the protections guaranteed by the First Amendment, which were "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people."  *Roth v. United States*, 354 U.S. 476, 484 (1957).

The need for a free exchange of information concerning the government's use of NSLs to obtain communications records is particularly acute because so little information is available to the public.  Not only has the government continued to obscure its own interpretations of the nature and scope of its authority to compel disclosure of communications records through the use of an NSL, but nondisclosure requirements imposed on NSL recipients like Merrill have severely limited the public's ability to know how NSLs are being utilized in practice to obtain communications records.

Moreover, data available from the Department of Justice's Office of the Inspector General ("OIG"), which has issued three major reports on the FBI's NSL usage, indicates that although hundreds of thousands of NSLs have been issued in the last decade, very few recipients have been permitted to speak openly about the experience.  The most recent data available from the OIG demonstrates that, on average, approximately 44,000 NSLs were issued each year from 2003 to 2011.  OIG, *A Review of the FBI's Use of NSLs: Assessment of Progress in Implementing Recommendations and Examination of Use in 2007 through 2009* 65 (Aug. 2014) ("*NSL Report III*").  And, in an earlier report, the OIG concluded based on the review of a random sample of NSLs that 97 percent of those issued imposed nondisclosure requirements.  OIG, *A Review of the FBI's Use of NSLs: Assessment of Corrective Actions and Examination of NSL Usage in 2006* 124 (Mar. 2008)  ("*NSL Report II*").  To date, only a handful of NSL recipients—including Merrill—have contested such nondisclosure requirements in court.[1]

---

[1] *See, e.g.*, Maria Bustillos, *What It's Like to Get a National-Security Letter*, The New Yorker (June 27, 2013), http://nyr.kr/1A1TkRm (reporting on the Internet Archive's successful challenge to an NSL it received in 2008); Alison Leigh Cowan, *Four Librarians Finally Break Silence in Records Case*, N.Y. Times (May 31, 2006), http://nyti.ms/1A1TdFA (reporting on the successful effort by a Connecticut library consortium to lift an NSL gag order); *see also In re NSL*, *Under Seal v. Holder*, Nos. 13-15957, 13-16731, and 13-16732 (9th Cir. argued Oct. 8, 2014).

Indeed, the only publicly available government interpretation of the FBI's authority to compel the production of communications records is a 2008 memo from the Office of Legal Counsel, which concluded that NSLs may only be used to seek subscriber information, "toll billing records," and "parallel" categories of information.  *See* Requests for Info. Under the Elec. Commc'ns Privacy Act, 32 Op. O.L.C. 2 (2008).  The OLC, however, acknowledged that ambiguity exists in the application of the phrase "toll billing records" to electronic communications.  *See NSL Report III*, at 74.  Nondisclosure requirements like the one at issue here prevent the public from knowing how the FBI interprets that ambiguous phrase and what types of communications records it believes it is authorized to seek with NSLs.  The result is that citizens are essentially unable to gain access to the executive branch's interpretation of a federal statute.

The First Amendment was intended to protect "free discussion of governmental affairs," including "structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes."  *Mills v. Alabama*, 384 U.S. 214, 218–19 (1966).  Indeed, the Supreme Court has recognized "the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means."  *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937).  As discussed in more detail below, disclosure of the information at issue here would greatly contribute to a more informed public discussion about the government's NSL program by, among other things, allowing the public to understand and evaluate the statutory and constitutional validity of the use of NSLs to obtain communications records.

III.    **The prior restraint at issue here prohibits speech on matters of substantial political and social importance.**

A.    **The information Merrill seeks to distribute to the public about the types of communications records that the FBI requests using NSLs has significant constitutional and statutory implications.**

Merrill's speech would be of particular value to the public not only because so little information about the NSL program or the government's interpretation of its NSL authority is currently available, but also because the FBI's use of NSLs to obtain communications records has significant statutory and constitutional implications.  The pervasiveness of the gag orders means that even detailed news reports on the NSL program have many unanswered questions, among them the scope of the FBI's authority to obtain communications records.  *See, e.g.,* Ellen Nakashima, *White House proposal would ease FBI access to records of Internet activity*, Wash. Post (July 29, 2010), http://wapo.st/1zVkFVi ("Government lawyers say this category of information includes the addresses to which an Internet user sends e-mail; the times and dates e-mail was sent and received; and possibly a user's browser history.").  In 2007, the FBI drafted a proposed amendment to its NSL authority that would have authorized the FBI to obtain specific communications records, including "temporarily assigned network address[es]" and "records identifying the origin, routing, or destination of electronic communications."  *NSL Report II* at 32.  That amendment, however, was never adopted, and as a result, the types of records accessible through NSLs has remained unclear.

Lifting the nondisclosure order on the attachment to the NSL at issue here would allow the public a rare glimpse of the types of communications records the FBI seeks through NSLs. Such information about the contours of the government's requests is essential for the public to evaluate whether the FBI's use of NSLs complies with statutory and constitutional requirements.

For example, the collection of email content is not authorized under ECPA's NSL provision.  *See* 18 U.S.C. § 2709(a) (authorizing requests for subscriber information and toll billing records).  Indeed, courts have held that the acquisition of the content of email requires a warrant under the Fourth Amendment.  *See Warshak v. United States*, 631 F.3d 266, 282 (6th Cir. 2010) (finding that compelling a service provider to turn over the content of email without a warrant is a Fourth Amendment violation).  Yet, as the OIG has found, the lack of clarity surrounding the definition of communications records has resulted in at least five "unauthorized collections" of content information from "one of the larger email service providers."  *NSL Report III*, 131–32.  The fact that at least one such provider interpreted requests for communications records in an NSL to require the production of content information calls into question whether the types of information being requested are adequately specific, and whether or not the FBI is interpreting the scope of its authority to compel disclosure of information using an NSL in conformance not only with statutory mandates, but with the guarantees of both the First and Fourth Amendments as well.

The Fourth Amendment's roots are intertwined with the First Amendment's guarantees of free speech and a free press, and Fourth Amendment protections play a vital role in shielding First Amendment activity from unreasonable and warrantless intrusion by the government.  The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const, amend. IV.  This prohibition on unreasonable searches of "papers" arose from the abusive colonial-era practice of targeting printers and publishers of dissenting publications.  Indeed, the history of the Fourth Amendment is "largely a history of conflict between the Crown and the press."  *Stanford v. Texas*, 379 U.S. 476, 482 (1965).  "The Bill of Rights was fashioned against

the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression" and for undermining freedom of the press. *Marcus v. Search Warrant*, 367 U.S. 717, 729 (1961).

In *Zurcher v. Stanford Daily*, the Supreme Court found that where the materials to be searched or seized "may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" 436 U.S. 547, 564 (1978). Because of the historic and contemporary link between the First and Fourth Amendments, the Court found that Fourth Amendment safeguards were adequate to protect First Amendment rights under the circumstances in that case. The Court in *Stanford Daily* emphasized that "if the requirements of specificity and reasonableness are properly applied, policed, and observed," there would be little opportunity for government officials to "rummage at large in newspaper files or to intrude into or to deter normal editorial and publication decisions." *Id.* at 566.

How the FBI defines communications records and the types of information it seeks without a warrant through the use of NSLs therefore has serious implications under both the First and Fourth Amendments. To the extent that the FBI requests or obtains content, for example, in response to NSLs compelling disclosure of "ECTR," it violates the First and Fourth Amendments. Lifting the prior restraint at issue here would enhance public scrutiny and debate by making clear what types of materials NSLs are used to seek and what protections the constitution requires.

Moreover, the types of communications records that the FBI might seek using an NSL also implicates other statutory provisions of federal law. In response to *Stanford Daily*, Congress enacted the Privacy Protection Act of 1980, 42 U.S.C. § 2000aa ("PPA"), which prohibits searches for certain types of materials related to newsgathering. The PPA "affords the press and

certain other persons not suspected of committing a crime with protections not provided currently by the Fourth Amendment." S. Rep. No. 96–874, at 4 (1980), *reprinted in* 1980 U.S.C.C.A.N. 3950, 3950–51. As a result, to the extent that NSLs purport to authorize searches or seizures of materials belonging to persons engaged in newsgathering, those searches are barred by the PPA, except in very few, limited circumstances. For this reason too, public scrutiny of the FBI's use of NSLs to obtain communications records is necessary.

### B.  NSLs, and the secrecy surrounding them, imperil the confidential relationship between reporters and sources.

Knowing what types of information the government can obtain without notice or judicial process is of the utmost importance to reporters and media organizations. The lack of clarity regarding the scope of the FBI's legal authority and its use of NSLs to obtain communications records makes it difficult for journalists to assure sources of confidentiality or know whether such assurances are valid. As Justice Stewart stated in his dissenting opinion in *Branzburg v. Hayes*, "[w]hen neither the reporter nor his source can rely on the shield of confidentiality against unrestrained use of [government] power, valuable information will not be published and the public dialogue will inevitably be impoverished." 408 U.S. 665, 736 (1972) (Stewart, J., dissenting).

### i.  The FBI has previously disregarded regulatory protections for the press by using informal requests to obtain news media records.

Federal regulations constrain the circumstances under which the FBI can obtain records of members of the news media. 28 C.F.R. § 50.10. Generally speaking, the Attorney General must authorize the use of a subpoena or warrant to obtain records, including communications transactional records, of members of the news media. § 50.10(a)(3). The "affected member of the news media" must also be given "reasonable and timely notice" of the request. § 50.10(a)(4). While these regulations do not refer expressly to NSLs or FISA warrants or applications, they

raise questions as to the propriety of the FBI's usage of NSLs to obtain records of members of the news media.

The FBI has a history of attempting to circumvent these regulatory requirements by seeking records of members of the news media using informal requests rather than the forms of process referred to in the federal regulations.  In 2007, during the OIG's first review of NSL usage, the OIG found that the FBI had frequently sought telephone toll billing records or subscriber information by using an "exigent letter" rather than the authorized methods of NSLs or grand jury subpoenas.  *NSL Report I* at 87.  In a follow-up investigation, the OIG identified three leak investigations in which journalists' records had been requested using methods that did not comply with 28 C.F.R. § 50.10.  OIG, *A Review of the Federal Bureau of Investigation's Use of Exigent Letters and Other Informal Requests for Telephone Records* 89 (Jan. 2010).  In one instance, the FBI obtained from a telephone provider 22 months of records for reporter Ellen Nakashima, 22 months of records for *The Washington Post* bureau in Jakarta, as well as records for journalists Alan Sipress, Natasha Tampubolon, Raymond Bonner and Jane Perlez using an exigent letter.  *See id.* at 95, 101.  The OIG called this "a complete breakdown in the required Department procedures for approving the issuance of grand jury subpoenas for reporters' toll billing records."  *Id.* at 103.

In another leak investigation, an FBI special agent emailed an analyst for a telephone company with "the name and cellular phone number of a reporter, facts explaining the relevance of calling activity by the reporter to the investigation, and information indicating that the cellular phone number of the reporter was in contact with the target number of the subpoena during a particular period."  *Id.* at 116.  Several phone companies then queried their own databases to

obtain the reporter's records.  OIG wrote that this was "a clear abuse of authority, in violation of the ECPA, federal regulation, and Department policy."  *Id.* at 121.

The FBI's prior use of informal requests to obtain the records of journalists in violation of both ECPA and federal regulations underscores the powerful interest of both the press and the public at large in receiving the speech that Merrill seeks to disseminate.  The use of NSLs to obtain the communications records of reporters flouts, at a minimum, regulatory protections for journalists and undermines press freedom.  Information of the kind that Merrill is restrained from making public concerning how the FBI interprets communications records for purposes of requesting information in an NSL is needed in order for the press and the public to ensure that the FBI is acting within its authority and with adequate regard for First Amendment values.

### ii.   The use of NSLs to obtain reporters' electronic communication transaction records puts confidentiality at risk.

As this Court has previously stated, the definition of communications records, while vague, could be interpreted to include "a log of email addresses with whom a subscriber has corresponded and the web pages that a subscriber visits."  *Doe v. Ashcroft*, 334 F. Supp. 471, 509 (S.D.N.Y. 2004).  The government's use of NSLs to obtain the electronic equivalent of a reporter's contact list or research history would destroy the ability of reporters to, among other things, communicate in confidence with sources through any electronic channel.  Indeed, the threat of compelled disclosure of email addresses and URL visits alone limits journalists' ability to gather information and report the news by chilling the exercise of First Amendment rights.

The response in 2013 to the revelation that the Justice Department had seized records from twenty Associated Press ("AP") telephone lines demonstrates the climate of fear that develops when government investigations directly target the news media.  *See* Mark Sherman, *Gov't obtains wide AP phone records in probe*, Associated Press (May 13, 2013, 10:53 PM),

http://bit.ly/11zhUOg.  After the news broke that the Department of Justice had subpoenaed the metadata from phone lines used by more than 100 AP reporters and editors—i.e. the numbers, timing and duration of calls, *see id*.—AP President and CEO Gary Pruitt said in a speech at the National Press Club that sources were less willing to talk to reporters at the news organization: "Some of our longtime trusted sources have become nervous and anxious about talking to us, even on stories that aren't about national security."  Jeff Zalesin, *AP chief points to chilling effect after Justice investigation*, The Reporters Comm. for Freedom of the Press (June 19, 2013), http://rcfp.org/x?CSPl (internal quotation marks omitted).  And that chilling effect, Pruitt said, has not been limited to the AP:  "Journalists at other news organizations have personally told me it has intimidated sources from speaking to them."  *Id.*  "In some cases," Pruitt stated, "government employees that we once checked in with regularly will no longer speak to us by phone and some are reluctant to meet in person."  *See* Lindy Royce-Bartlett, *Leak probe has chilled sources, AP exec says*, CNN (June 19, 2013, 10:08 PM), http://bit.ly/11NGbOH (internal quotation marks omitted).

The chilling effect of compelled disclosure of communications information is all the more concerning where, as here, the types of information that may be obtained by the government remain undefined.  The lack of clarity regarding the definition of communications records impedes the ability of individuals—including reporters and their sources—to communicate with one another in confidence.  Indeed, the uncertainty about whether their communications with reporters are at risk of disclosure to the government has caused sources who could inform reporting on a wide range of issues to fall silent.  *See* Comm. to Protect Journalists, *The Obama Administration and the Press: Leak investigations and surveillance in post-9/11 America* (Oct. 10, 2013), http://bit.ly/1c3Cnfg; Jamie Schuman, *The shadows of the*

*spooks*, The News Media and the Law, Fall 2013, *available at* http://bit.ly/1f16OaS.  This chilling effect on the exercise of First Amendment rights is yet another reason why the prior restraint at issue in this case is harmful not only to Merrill but to the press and the public as well.

## CONCLUSION

For the foregoing reasons, *amici curiae* respectfully urge this Court to grant Merrill's motion for summary judgment.

DATED: March 18, 2015                   Respectfully submitted,


  /s/ Michael D. Steger____
Michael D. Steger
STEGER KRANE LLP
1601 Broadway, 12th Floor
New York, NY  10019
(212) 736-6800
msteger@skattorney.com
*Counsel of record*

Bruce Brown
Katie Townsend
Hannah Bloch-Wehba
The Reporters Committee for Freedom of the Press
1156 15th St. NW, Suite 1250
Washington, D.C. 20005
(202) 795-9300
*Of counsel*
*additional *amici* counsel listed below

Kevin M. Goldberg
Fletcher, Heald & Hildreth, PLC
1300 N. 17th St., 11th Floor
Arlington, VA 22209
*Counsel for American Society of News Editors*
and *Association of Alternative Newsmedia*

Jonathan Bloom
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
*Counsel for Association of American Publishers, Inc.*

Rachel Matteo-Boehm
Bryan Cave LLP
560 Mission Street, Suite 2500
San Francisco, CA 94105
*Counsel for Courthouse News Service*

Mark H. Jackson
Jason P. Conti
Jacob P. Goldstein
Dow Jones & Company, Inc.
1211 Avenue of the Americas
New York, NY 10036
*Counsel for Dow Jones & Company, Inc.*

Peter Scheer
First Amendment Coalition
534 Fourth St., Suite B
San Rafael, CA 94901

Karole Morgan-Prager
Juan Cornejo
The McClatchy Company
2100 Q Street
Sacramento, CA 95816

David S. Bralow
General Counsel
MediaNews Group
448 Lincoln Highway
Fairless Hills, PA 19030

James Cregan
Executive Vice President
MPA – The Association of Magazine Media
1211 Connecticut Ave. NW Suite 610
Washington, DC 20036

Mickey H. Osterreicher
1100 M&T Center, 3 Fountain Plaza,
Buffalo, NY 14203
*Counsel for National Press Photographers Association*

Kurt Wimmer
Covington & Burling LLP
1201 Pennsylvania Ave., NW
Washington, DC 20004
*Counsel for the Newspaper Association of America*

Barbara L. Camens
Barr & Camens
1025 Connecticut Ave., NW

Suite 712
Washington, DC 20036
*Counsel for The News Guild – CWA*

Michael Kovaka
Cooley LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
*Counsel for Online News Association*

Kathleen A. Kirby
Wiley Rein LLP
1776 K St., NW
Washington, DC 20006
*Counsel for Radio Television Digital News Association*

Gail C. Gove
Chief Counsel, News
Katharine Larsen
Counsel, News
Reuters America LLC
3 Times Square, 20th Floor
New York, NY 10036
*Counsel for Reuters America LLC*

Bruce E. H. Johnson
Davis Wright Tremaine LLP
1201 Third Ave., Suite 2200
Seattle, WA 98101
*Counsel for The Seattle Times Co.*

Frank D. LoMonte
Student Press Law Center
1101 Wilson Blvd., Suite 1100
Arlington, VA 22209

John B. Kennedy
James A. McLaughlin
Kalea S. Clark
The Washington Post
1150 15th Street, N.W.
Washington, D.C. 20071