## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

NICHOLAS MERRILL,

              Plaintiff,

    v.

ERIC HOLDER, Jr., in his official capacity as
Attorney General of the United States, and
JAMES B. COMEY, in his official capacity as
Director of the Federal Bureau of Investigation,

              Defendants.

14 Civ. 9763 (VM)

~~SEALED~~

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF
## NICHOLAS MERRILL'S MOTION FOR SUMMARY JUDGMENT

Jonathan Manes, supervising attorney
David A. Schulz, supervising attorney
Benjamin Graham, law student intern
Matthew Halgren, law student intern
Nicholas Handler, law student intern
Amanda Lynch, law student intern
MEDIA FREEDOM AND INFORMATION
  ACCESS CLINIC
YALE LAW SCHOOL
P.O. Box 208215
New Haven, CT 06520
Tel: (203) 432-9387
Fax: (203) 432-3034
jonathan.manes@yale.edu

*Attorneys for Plaintiff Nicholas Merrill*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS..........................................................................................................3

    A. Mr. Merrill Remains Subject to a Prior Restraint Long After the Investigation That
       Prompted It Has Ended ....................................................................................................3

    B. The Continuing Restraint Prevents Mr. Merrill from Disclosing the Scope of
       Authority to Surveil Claimed in the 2004 NSL ...............................................................3

    C. The Prior Restraint Prevents Mr. Merrill from Disclosing the Highly Intrusive Nature
       of the FBI's NSL Surveillance.........................................................................................5

    D. The Prior Restraint Prevents Mr. Merrill from Making a Uniquely Valuable
       Contribution to the Ongoing Public Debate Over Domestic Surveillance ..........................5

    E. The Prior Restraint Contradicts the Administration's Stated Policy ...................................7

    F. Mr. Merrill Has Engaged in a Decade-Long Effort to Remove the Prior Restraint ............8

        1. This Court Struck Down the NSL Statute Twice............................................................8

        2. The Court of Appeals Partially Invalidated the NSL Statute..........................................9

        3. This Court Upheld Much of the Gag Order in Light of a Then-Ongoing
           Investigation....................................................................................................................9

        4. Mr. Merrill Was Permitted to Identify Himself and the Target of the NSL ................10

ARGUMENT..........................................................................................................................11

I. THE ONGOING PRIOR RESTRAINT IMPOSED ON MR. MERRILL
   VIOLATES THE FIRST AMENDMENT .......................................................................11

    A. The Gag Order Is Subject to the Most Exacting Constitutional Scrutiny...........................12

        1. The Eleven-Year-Old, Open-Ended Gag Order Is Essentially a Permanent Ban on
           Speech............................................................................................................................13

        2. The Prior Restraint Is a Content-Based Speech Restriction .........................................15

        3. The Prior Restraint Suppresses Core Political Speech .................................................15

    B. The Gag Order Cannot Survive Strict Scrutiny ...............................................................17

        1. The FBI Cannot Identify Any Compelling Interest That Supports Continuing the
           Prior Restraint................................................................................................................17

         2. The Ongoing Prior Restraint Is Not Narrowly Tailored ..............................................19

II. EVEN UNDER THE LOWER STANDARD APPLIED IN *JOHN DOE, INC. V.
   *MUKASEY*, THE FBI'S GAG ORDER CANNOT BE JUSTIFIED................................20

III. THE NSL STATUTE DOES NOT AUTHORIZE THE FBI'S ONGOING GAG ON
    MR. MERRILL'S SPEECH ...........................................................................................21

    A. The Statute's Nondisclosure Provision Only Protects the Integrity of a Specific,
       Ongoing Investigation....................................................................................................22

B. An Interpretation of the Statute That Permits the Gag Order to Continue Indefinitely Would Raise Serious Constitutional Questions That This Court Can and Should Avoid............................................................................................................25

**CONCLUSION** ...............................................................................................**26**

# TABLE OF AUTHORITIES

## CASES

*Buckley v. Valeo,*
424 U.S. 1 (1976) (per curiam) ........................................................................ 16

*Butterworth v. Smith,*
494 U.S. 624 (1990) ................................................................................ 13, 14

*Capital Cities Media, Inc. v. Toole,*
463 U.S. 1303 (1983) ....................................................................................... 14

*Caplan v. Bureau of Alcohol, Tobacco & Firearms,*
587 F.2d 544 (2d Cir. 1978) ............................................................................. 16

*Doe v. Ashcroft,*
334 F. Supp. 2d 471 (S.D.N.Y. 2004) ......................................... 5, 8, 15, 19

*Doe v. Gonzales,*
449 F.3d 415 (2d Cir. 2006) ............................................................................... 8

*Doe v. Gonzales,*
500 F. Supp. 2d 379 (S.D.N.Y. 2007) .............................................................. 9

*Doe v. Holder,*
640 F. Supp. 2d 517 (S.D.N.Y. 2009) ............................................................ 21

*Doe v. Holder,*
665 F. Supp. 2d 426 (S.D.N.Y. 2009) .................................................... passim

*Doe v. Holder,*
703 F. Supp. 2d 313 (S.D.N.Y. 2010) ...................................................... 10, 24

*Dow Jones & Co. v. Kaye,*
90 F. Supp. 2d 1347 (S.D. Fla. 2000) ............................................................. 13

FCC v. Fox TV Stations, Inc.,
556 U.S. 502 (2009) .......................................................................................... 25

In re Sealing & Non-Disclosure of Pen/Trap/2703(d) Orders,
562 F. Supp. 2d 876 (S.D. Tex. 2008) ............................................................ 18

*INS v. St. Cyr,*
533 U.S. 289 (2001) .......................................................................................... 25

*John Doe, Inc. v. Mukasey,*
549 F.3d 861 (2d Cir. 2009) ...................................................................... passim

*Kamasinski v. Judicial Review Council,*
  44 F.3d 106 (2d Cir. 1994).............................................................................. 13

*Mills v. Alabama,*
  384 U.S. 214 (1966)....................................................................................... 16

*N.Y. Times Co. v. Sullivan,*
  376 U.S. 254 (1964)....................................................................................... 16

*N.Y. Times Co. v. United States,* 403 U.S. 713 (1971) ......................................... 12, 17

*Near v. State of Minnesota ex rel. Olson,*
  283 U.S. 697 (1931)....................................................................................... 14

*Nebraska Press Ass'n v. Stuart,*
  427 U.S. 539 (1976)....................................................................................... 12

*NLRB v. Catholic Bishop of Chicago,*
  440 U.S. 490 (1979)....................................................................................... 25

*Org. for a Better Austin v. Keefe,*
  402 U.S. 415 (1971)....................................................................................... 12

*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992)....................................................................................... 15

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
  502 U.S. 105 (1991)....................................................................................... 15

**STATUTES AND CONSTITUTIONAL PROVISIONS**

U.S. Const. amend I.................................................................................... passim

5 U.S.C. § 552(b)(7)(E) ..................................................................................... 24

18 U.S.C. § 2703................................................................................................ 19

18 U.S.C. § 2709.................................................................................... 4, 21, 22

18 U.S.C. § 3511................................................................................. 4, 21, 22, 23

50 U.S.C. § 1861.......................................................................................... 5, 19

50 U.S.C. § 3507................................................................................................ 23

50 U.S.C. § 3024(i)(1) ...................................................................................... 23

USA PATRIOT Act of 2001, Pub. L. No. 107-56 § 505(a), 115 Stat. 272, 365 (codified as
  amended at 18 U.S.C. § 2709) ........................................................................ 4

USA PATRIOT Reauthorization and Improvement Act of 2005, Pub. L. No. 109-177, §§
 115-18, 120 Stat. 192, 211-21 (Mar. 9, 2006) (codified at 18 U.S.C. § 3511)..................... 8

## OTHER AUTHORITIES

160 Cong. Rec. H4803 (daily ed. May 22, 2014) ............................................................................ 6

160 Cong. Rec. S6079 (daily ed. Nov. 18, 2014) ............................................................................ 6

Fed. R. Civ. P. 56 ........................................................................................................................... 11

Stipulation and Order Modifying Judgment,
 *Doe v. Holder*, No. 04-cv-2614 (S.D.N.Y. Apr. 15, 2014) ...................................... 3, 10, 18

Stipulation and Order of Dismissal,
 *Doe v. Holder*, No. 04-cv-2614 (S.D.N.Y. July 30, 2010) ...................................... 3, 10, 13

USA FREEDOM Act, H.R. 3361, 113th Cong. (2013) ..................................................................... 6

USA FREEDOM Act, S. 2685, 113th Cong. (2014) ......................................................................... 6

## PRELIMINARY STATEMENT

Since 2004, the government has restrained Nicholas Merrill from speaking on a matter of great public concern. The injunction against Mr. Merrill's speech was imposed administratively through a National Security Letter issued by the FBI (the "2004 NSL") that simultaneously sought to compel him to surrender sensitive information about a client of his Internet service. Eleven years later, the FBI's investigation is long over, the identity of the investigation's target is no longer secret, and the circumstances surrounding the issuance of the 2004 NSL have been fully disclosed. But the government continues to demand silence from Mr. Merrill on a key issue: it refuses to allow him to discuss the types of information the FBI sought from his company.

When Congress enacted the USA PATRIOT Act in the wake of 9/11, it vested the FBI with vast but vague power to collect information about Americans' online activity in secret by issuing National Security Letters ("NSLs"). The statute permits the FBI to obtain "electronic communication transactional records" ("ECTR") of U.S. citizens with no judicial approval, requiring only that an FBI employee certify that the records are "relevant" to an investigation. No statute, regulation, or judicial opinion defines what kinds of records constitute ECTR or clarifies the types of information the FBI may secretly collect. But the 2004 NSL issued to Mr. Merrill does.

An attachment to the 2004 NSL (the "Attachment") describes what the FBI wanted from Mr. Merrill and reveals the range of information the FBI believes it is authorized to sweep up as ECTR. It is this information that the FBI insists Mr. Merrill must still keep secret. Because the Attachment and similar demands in other NSLs remain subject to prior restraints, the public does not know just how broadly the FBI interprets the term ECTR—so broadly that it can encompass information revealing the identity of an anonymous online speaker or the highly sensitive details

1

of a person's activities, contacts, and affiliations. The FBI's ability to obtain such information simply by issuing an NSL, without meaningful judicial oversight, raises serious concerns about individual privacy, freedom of speech, and freedom of association that the American public is entitled to understand and debate.

If the government is permitted to continue to ban Mr. Merrill's speech more than a decade after the fact, there is no reason to believe any NSL recipient will ever be permitted to inform the public about the FBI's application of its NSL authority. The FBI has issued several hundred thousand NSLs since the passage of the USA PATRIOT Act. Mr. Merrill appears to be unique among these NSL recipients insofar as his past battles over the prior restraint imposed on him have forced the government to lift the gag on the identity of the NSL's target and the circumstances surrounding its issuance. The government's insistence on maintaining the remainder of the injunction makes clear that it has nothing to do with protecting the details of any specific investigation, but rather reflects a systematic censorship scheme imposed on all NSL recipients in order to hide the scope of surveillance authority claimed by the FBI.

The NSL statute does not authorize the FBI to enforce such a sweeping system of prior restraints, and the First Amendment forbids it. Under the statute, a nondisclosure order must be tied to a specific investigation; once that investigation is over, as here, the FBI's authority to gag is exhausted. Under the First Amendment, the ongoing gag on Mr. Merrill is subject to exacting scrutiny for three reasons: it is essentially a permanent prohibition on speech, it prohibits core political speech about government actions, and it is a content-based restriction. The American public is plainly entitled to know the types of information the FBI is routinely sweeping up through its power to issue NSLs, and a permanent restraint on Mr. Merrill's speech is plainly improper. This Court should lift the gag order forthwith, in its entirety.

## STATEMENT OF FACTS

### A. Mr. Merrill Remains Subject to a Prior Restraint Long After the Investigation that Prompted It Has Ended

In 2004, Mr. Merrill was the owner and operator of Calyx Internet Access, which offered a number of Internet-related services to its clients. SUMF ¶ 2. In February 2004, an FBI agent served Mr. Merrill with the 2004 NSL, which directed him "to provide the [FBI] the names, addresses, lengths of service and electronic communication transactional records" pertaining to one of his clients. SUMF ¶ 3; Merrill Decl. Ex. A. The Attachment to the 2004 NSL identified the specific categories of ECTR required by the FBI. SUMF ¶ 5.A; Merrill Decl. Ex. B.

The NSL also imposed a complete gag on Mr. Merrill, forbidding him "from disclosing to any person that the FBI has sought or obtained access to information or records under these provisions." SUMF ¶ 6; Merrill Decl. Ex. A. Eleven years later, Mr. Merrill remains forbidden from describing most of the categories of records the FBI demanded in the Attachment. In 2010, after six years of litigation described below, Mr. Merrill was permitted to identify himself as the recipient of the NSL. Stip. and Order of Dismissal, *Doe v. Holder*, No. 04-cv-2614 (S.D.N.Y. July 30, 2010); Manes Decl. Ex. C. In 2014, the government further conceded that, in light of "changed circumstances," Mr. Merrill could freely discuss nearly all aspects of the NSL, including the identity of its target. Stip. and Order Mod. J., *Doe v. Holder*, No. 04-cv-2614 (S.D.N.Y. Apr. 15, 2014), Manes Decl. Ex. A. It is therefore clear that the investigation of which the 2004 NSL was a part is over. SUMF ¶ 23, 25. Yet the government still prohibits Mr. Merrill from describing the types of records the FBI believed it could obtain with an NSL.

### B. The Continuing Restraint Prevents Mr. Merrill from Disclosing the Scope of Authority to Surveil Claimed in the 2004 NSL

The NSL statute authorizes the FBI to require an "electronic communication service provider" to produce ECTR in addition to "subscriber information and toll billing records." 18

3

U.S.C. § 2709(a). NSLs may be issued by FBI officials at headquarters or in field offices upon a

mere written certification that the records sought are "relevant to an authorized investigation to

protect against international terrorism or clandestine intelligence activities." 18 U.S.C. §

2709(b)(1). Due to amendments made by the USA PATRIOT Act, NSLs can be used to obtain

records about U.S. citizens, even absent any showing of a nexus to a foreign power. Pub. L. No.

107-56 § 505(a), 115 Stat. 272, 365 (2001) (codified as amended at 18 U.S.C. § 2709). NSL

orders to compel production of records are not subject to any judicial oversight unless the NSL

recipient initiates a court challenge. 18 U.S.C. § 3511(a). Since 2001, the FBI has issued

hundreds of thousands of NSLs. SUMF ¶ 29.

    The types of records that constitute ECTR, and that can therefore be obtained using an

NSL, are not defined by statute or in any regulation or judicial opinion. SUMF ¶ 29.B. In issuing

an NSL, the FBI frequently includes an attachment that lists the types of information *it* regards as

ECTR, in order to inform the NSL recipient of what records to disclose. SUMF ¶¶ 4-5. The NSL

that Mr. Merrill received had such an attachment, specifying the categories of ECTR that the FBI

said were subject to compelled disclosure. SUMF ¶ 4-5; Merrill Decl. Ex. B. Because Mr.

Merrill is forbidden from discussing nearly all of the Attachment, he cannot inform the public

about the scope of the surveillance authority that the FBI has claimed.[1] SUMF ¶ 45-46.

---

[1] In 2008, the DOJ's Office of Legal Counsel ("OLC") issued a memorandum regarding the scope of the
FBI's NSL authority that, in a footnote, stated that the FBI's authority to obtain ECTR "reaches only
those categories of information *parallel to* subscriber information and toll billing records for ordinary
telephone service." Manes Decl. Ex. I (emphasis added). Neither that memorandum nor any subsequent
document clarifies what types of records are the electronic "parallels" of traditional toll billing records. It
remains unclear whether the 2008 memorandum resulted in a substantive change in the FBI's
understanding of the scope of its NSL authority or whether the FBI continues to require NSL recipients to
produce the same categories of ECTR specified in the Attachment that Mr. Merrill received. The prior
restraint on Mr. Merrill thus not only prevents him from disclosing the scope of the FBI's claimed NSL
authority in 2004, but also from explaining whether the FBI's 2004 understanding of ECTR is
inconsistent with the OLC memo.

4

**C.    The Prior Restraint Prevents Mr. Merrill from Disclosing the Highly Intrusive Nature of the FBI's NSL Surveillance**

The FBI's prior restraint prevents Mr. Merrill from alerting the public that the FBI's interpretation of the scope of ECTR enables the government to obtain highly sensitive information simply by issuing an NSL without any meaningful likelihood of judicial oversight. Though the information collected by NSLs is arguably "non-content" data, it can nonetheless be extremely revealing. SUMF ¶¶ 8-12. Because of the FBI's expansive understanding of ECTR, as revealed in the Attachment, records obtained using NSLs can easily expose a person's intimate relationships; religious, political, and community affiliations; long-term plans; financial condition; medical concerns; and more. SUMF ¶ 12.A-E. Indeed, this Court has previously found that "information available through a § 2709 NSL served upon an ISP could easily be used to disclose vast amounts of anonymous speech and associational activity" and even "information protected by the [NSL target's] attorney-client privilege." *Doe v. Ashcroft*, 334 F. Supp. 2d 471, 508-09 (S.D.N.Y. 2004). Because Mr. Merrill is forbidden from discussing most of the contents of the Attachment, he is unable to articulate in detail many of the ways in which the scope of the FBI's claimed NSL authority can intrude upon individual privacy and civil liberties. SUMF ¶ 46.

**D.    The Prior Restraint Prevents Mr. Merrill from Making a Uniquely Valuable Contribution to the Ongoing Public Debate Over Domestic Surveillance**

The public is in the midst of a spirited debate examining the proper scope of the government's counterterrorism surveillance authorities. For instance, there was widespread concern when the public learned that the FBI had persuaded the Foreign Intelligence Surveillance Court to allow bulk collection of all domestic calling records on the theory that all such "business records" were "relevant" to a counterterrorism investigation and therefore subject to disclosure under Section 215 of the USA PATRIOT Act, 50 U.S.C. § 1861. SUMF ¶¶ 35-36. These disclosures have prompted a vigorous public discussion about how easily the government

5

should be permitted to collect "non-content" information that reveals deeply sensitive personal details. SUMF ¶¶ 35-38. Like Section 215, the NSL statute appears to permit collection only of "non-content" information on a "relevance" standard. However, unlike Section 215 collection, no judicial approval is required before an NSL issues. Moreover, prior abuses of the government's NSL authority have been well documented. SUMF ¶ 34. There therefore remains significant concern about the manner in which the FBI uses NSLs to obtain information about citizens. Indeed, these concerns led Congress to consider amendments to the NSL statute that received overwhelming support in the House and fell just two votes shy of the necessary sixty-vote supermajority for cloture in the Senate a few months ago.[2]

Mr. Merrill could make a uniquely valuable contribution to this ongoing public debate if he were not still subject to a prior restraint. Mr. Merrill is an expert in online security and privacy and is committed, both personally and professionally, to protecting individual liberties in the digital age. SUMF ¶¶ 41-48. He has consistently sought to engage in the public debate regarding the scope of the FBI's NSL authority, going so far as to publish an anonymous op-ed in the *Washington Post* in 2007 while he was still subject to a complete gag order. SUMF ¶ 43. He has been profiled and quoted extensively in media coverage of the public controversy about NSLs and has received awards for his advocacy on the issue. SUMF ¶ 42. He currently serves as executive director of the Calyx Institute, a non-profit organization devoted to protecting privacy and freedom of expression. SUMF ¶ 41.

But for the ongoing gag order, Mr. Merrill would not only be able to inform the public about how the FBI has defined ECTR, but he could also discuss in concrete terms the kinds of

---

[2] The USA FREEDOM Act, which passed the House of Representatives by a vote of 303 to 121, 160 Cong. Rec. H4803 (daily ed. May 22, 2014), and was only two votes short of a supermajority in the Senate, 160 Cong. Rec. S6079 (daily ed. Nov. 18, 2014), would have significantly reformed the scope of the FBI's NSL authority. H.R. 3361, 113th Cong. (2013); S. 2685, 113th Cong. (2014).

privacy and First Amendment harms—and significant potential for abuse—that can result from the FBI's claimed NSL surveillance authority. SUMF ¶ 46. Without this Court's intervention, Mr. Merrill faces a permanent ban on his ability to speak to these vital questions. SUMF ¶ 26.

### E. The Prior Restraint Contradicts the Administration's Stated Policy

The government itself has acknowledged that the transparency regarding NSLs sought in this lawsuit is both necessary and proper. In a January 2014 speech, the President directed the Attorney General to limit the duration of NSL gag orders, promising that "this secrecy will not be indefinite, [and] it will terminate within a fixed time unless the government demonstrates a real need for further secrecy." Manes Decl. Ex. S; SUMF ¶ 39. His speech was made in response to the recommendations of his Review Group on Intelligence and Communications Technologies, which urged that NSLs be issued only with judicial approval, that NSL nondisclosure orders be approved by a judge in the first instance and reapproved every 180 days, and, most relevant here, that NSL recipients be permitted to disclose "the general categories of information" provided in response to NSLs. Manes Decl. Ex. Q, at 89, 122-23; SUMF ¶ 38.

Implementing the President's directive, the Director of the Office of National Intelligence announced a supposed change in policy just five weeks ago, declaring that "the FBI will now presumptively terminate National Security Letter nondisclosure orders at the earlier of three years after the opening of a fully predicated investigation or the investigation's close." Manes Decl. Ex. T; SUMF ¶ 40. The policy stated that gag orders would only be maintained beyond those limits on a case-by-case basis, where there was a special justification for doing so. *Id.* The government's defense of the gag order here appears to directly contradict its stated policy: the gag order is more than eleven years old, the underlying investigation is evidently closed, and any justification for continuing to gag the Attachment would apply to *all* NSLs and would not be particular to the circumstances of Mr. Merrill's NSL. The government therefore appears to be

7

defending in court precisely the kind of permanent gag order that it has disavowed in public as a matter of policy.

### F. Mr. Merrill Has Engaged in a Decade-Long Effort to Remove the Prior Restraint

In April 2004, Mr. Merrill and Calyx Internet Access filed a "John Doe" lawsuit together with the ACLU challenging the constitutionality of both the substantive authority conferred by the NSL statute to compel disclosure and the law's gag provisions. SUMF ¶ 13. The litigation resulted in several significant rulings in this Court and in the Court of Appeals.

#### 1. This Court Struck Down the NSL Statute Twice

In September 2004, this Court struck down the NSL nondisclosure regime because it "works as both a prior restraint on speech and as a content-based restriction, and hence, is subject to strict scrutiny." *Doe v. Ashcroft*, 334 F. Supp. 2d 471, 511 (S.D.N.Y. 2004). This Court emphasized that the NSL statute "impose[d] a *permanent* bar on disclosure in every case, making no distinction among competing relative public policy values over time." *Id.* at 519.

While the government's appeal was pending, Congress amended the NSL statute, adding a procedure for judicial review, among other changes. Pub. L. No. 109-177, §§ 115-18, 120 Stat. 192, 211-21 (Mar. 9, 2006) (codified at 18 U.S.C. § 3511). The Court of Appeals consequently remanded the case so that this Court could address the amended law's constitutionality in the first instance. *Doe v. Gonzales*, 449 F.3d 415, 421 (2d Cir. 2006). Judge Cardamone concurred specifically to warn that—contrary to the government's continued "insist[ence] that a permanent ban on speech is permissible under the First Amendment"—"a perpetual gag on citizen speech of the type advocated so strenuously by the government may likely be unconstitutional." *Id.*

On remand, this Court again struck down the statute, finding that it "embodies both a prior restraint and a content-based restriction on speech" and failed under strict scrutiny. *Doe v.*

*Gonzales*, 500 F. Supp. 2d 379, 397 (S.D.N.Y. 2007). With respect to narrow tailoring, this Court observed that "[i]nternational terrorism investigations might generally last longer than run-of-the-mill domestic criminal investigations, but they do not last forever" and that "it is hard to conceive of any circumstances that would justify a permanent bar on disclosure." *Id.* at 421.

        2.     *The Court of Appeals Partially Invalidated the NSL Statute*

On appeal, the Court of Appeals determined that the NSL statute did not comply with the First Amendment but declined to strike the statute down in its entirety. *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 879, 883 (2d Cir. 2009) ("*John Doe, Inc.*"). Instead, it construed the statute's gag provision to require a showing of "good reason to believe that disclosure may result in . . . a harm related to an authorized investigation to protect against international terrorism or clandestine intelligence activities." *Id.* at 882 (internal quotations omitted). The court partially invalidated the statute insofar as it failed to require the government to initiate judicial review and required a reviewing court to give conclusive deference to certain government certifications. *Id.* at 883-85. Because it was considering an initial, facial challenge to the NSL statute, the Second Circuit focused on the procedural deficiencies of the statute and did not have occasion to determine whether an NSL's permanent prohibition on speech could be justified on a mere "good reason" standard, even after the investigation that prompted the NSL had concluded. *See id.*

        3.     *This Court Upheld Much of the Gag Order in Light of a Then-Ongoing Investigation*

On remand, this Court initially held that the government had met its burden to show "good reason" for the gag, applying the Second Circuit's construction of the statute. Yet the Court emphasized that its "ruling does not constitute a permanent bar on the NSL's disclosure," holding that the "First Amendment requires that a nondisclosure order be maintained only as long as it is 'narrowly tailored to promote a compelling Government interest.'" *Doe v. Holder*,

665 F. Supp. 2d 426, 433 (S.D.N.Y. 2009). On a motion for reconsideration, the Court lifted the nondisclosure order as to part of the Attachment holding that "(1) material within the scope of information that the NSL statute identifies as permissible for the FBI to obtain through use of NSLs, and (2) material that the FBI has publicly acknowledged it has previously requested by means of NSLs" could be disclosed. *Doe v. Holder*, 703 F. Supp. 2d 313, 316 (S.D.N.Y. 2010). The remainder of the gag order was upheld on the grounds that an investigation was "ongoing," thus reflecting an understanding that the requirement would not be permanent. *Id.*

   *4.  Mr. Merrill Was Permitted to Identify Himself and the Target of the NSL*

  While this Court's 2010 decision was pending on appeal, the parties reached a settlement under which the FBI agreed to permit Mr. Merrill finally to identify himself as the recipient of the NSL at issue in the litigation. *See* Stip. and Order of Dismissal, *Doe v. Holder*, No. 04-cv-2614 (S.D.N.Y. July 30, 2010); Manes Decl. Ex. C. Mr. Merrill remained subject to that revised gag order for four years. During that time, the FBI never contacted him or the Court to assert the continuing necessity—or lack thereof—of the gag order. SUMF ¶ 18. However, at some point during those four years, the need for continuing secrecy surrounding the 2004 NSL did in fact end. When Mr. Merrill's counsel notified Defendants' counsel that he intended once again to challenge the gag order, the FBI responded by conceding that due to "changed circumstances" there was no longer any reason to silence Mr. Merrill with respect to the identity of the person who was the target of the NSL or any other circumstances surrounding the issuance of the NSL and the investigation of which it was a part. Stip. and Order Mod. J., *Doe v. Holder*, No. 04-cv-2614 (S.D.N.Y. Apr. 15, 2014); Manes Decl. Ex. A. The government nevertheless refused to lift the gag order with respect to the remaining contents of the Attachment. *Id.* This litigation followed.

## ARGUMENT

Mr. Merrill's motion for summary judgment should be granted because "there is no genuine issue as to material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. There are no relevant facts in dispute regarding the scope of the gag order and the circumstances that surround it. Because the gag order both violates the First Amendment and exceeds the FBI's statutory authority to impose nondisclosure orders, Nicholas Merrill is entitled to summary judgment and to an order removing the gag in its entirety.

## I. THE ONGOING PRIOR RESTRAINT IMPOSED ON MR. MERRILL VIOLATES THE FIRST AMENDMENT

The prior restraint on Mr. Merrill is subject to the most stringent constitutional scrutiny available under the First Amendment for three reasons: it constitutes an effectively permanent prohibition on truthful, protected speech; it constitutes a content-based restriction on speech; and it prohibits core political speech regarding the government's activities. In order to continue silencing Mr. Merrill, the government must, at a minimum, "survive the test of strict scrutiny . . . where the government must show that the statute is narrowly tailored to meet a compelling government interest." *Doe v. Holder*, 665 F. Supp. 2d at 433 (quoting *Doe v. Gonzales*, 449 F.3d at 442 (Cardamone, J. concurring)).

Under the changed circumstances of the present case, it is not sufficient for the government simply to persuade this Court that there is a "good reason" to conclude that "disclosure may result in one of the enumerated harms" set forth in the statute. *John Doe, Inc.*, 549 F.3d at 876. When the Court of Appeals in *John Doe, Inc.* construed the NSL statute to require merely a showing of "good reason" in order to sustain a gag order, it was considering a facial challenge to the statute. Its conclusion that a "good reason" standard might suffice under the First Amendment was premised on the circumstances typically existing when an NSL is

issued. In those cases, a gag broadly prohibits the recipient from saying anything about the NSL for the limited time that a particular investigation is ongoing and such broad secrecy may be necessary to protect national security. But the instant case presents an as-applied challenge to a gag order that has become essentially permanent and that displays all of the hallmarks of the worst prior restraints: it is long-term and open-ended; it is untethered from any ongoing investigation or other temporary circumstances; it targets speech based on its content; it is directed at suppressing public discussion of the scope of the government's claimed authority under a statute; and it has the effect of shielding the government from legitimate scrutiny and criticism. For these reasons, elaborated below, this Court must subject the gag order to the most exacting constitutional scrutiny, a test the gag order certainly cannot survive.

## A.     The Gag Order Is Subject to the Most Exacting Constitutional Scrutiny

In reviewing the FBI's continuing gag order against Mr. Merrill, this court should apply the strictest scrutiny. Courts have consistently held that prior restraints such as this one are "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). "Any prior restraint on expression comes to [court] with a heavy presumption against its constitutional validity." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (internal citations omitted); *see also N.Y. Times Co. v. United States*, 403 U.S. 713, 730 (1971) ("*Pentagon Papers*") (Stewart, J., concurring) (explaining that a prior restraint cannot be justified unless "disclosure . . . will surely result in direct, immediate, and irreparable damage to our Nation or its people"). The gag order at issue here is subject to this most stringent burden of justification, which the government cannot meet.

Three aspects of this gag order render it particularly threatening to First Amendment values and require an especially searching constitutional analysis: it is effectively permanent, it is content-based, and it forbids core political speech about government activities.

## 1. The Eleven-Year-Old, Open-Ended Gag Order Is Essentially a Permanent Ban on Speech

The gag order here persists despite being untethered from the investigation that prompted its issuance. SUMF ¶¶ 20-27. Mr. Merrill is permitted to disclose the target of the 2004 NSL along with all other information specific to the particular investigation of which the NSL was part. *See* Stip. and Order Mod. J., *Doe v. Holder*, No. 04-cv-2614 (S.D.N.Y. Apr. 15, 2014), Manes Decl. Ex. A. Without a time-limited basis in an ongoing investigation, the gag order has become a permanent ban on speech.

No court has ever permitted the government to impose an effectively permanent ban on speech. Indeed, courts have only upheld prior restraints narrowly drawn not to extend past the investigations or specific circumstances that initially justified them. In *Butterworth v. Smith,* the Supreme Court invalidated a Florida statute that prevented witnesses from ever disclosing testimony that they provided to a grand jury. 494 U.S. 624, 625 (1990). The court held that, while a temporary restraint on disclosure might be sustained while a grand jury was impaneled, a "ban [that] extends not merely to the life of the grand jury but into the indefinite future" is indefensible under the First Amendment. *Id.* at 635. Similarly, in *Kamasinski v. Judicial Review Council*, the Second Circuit held that a prohibition on public discussion of judicial complaints "is constitutional only so long as the [Judicial Review Commission] acts in its investigatory capacity." 44 F.3d 106, 112 (2d Cir. 1994). Once the investigation has been completed, even the state's "most compelling interests cannot justify a ban" on speech. *Id.*; *see also, e.g., Dow Jones & Co. v. Kaye*, 90 F. Supp. 2d 1347, 1361 (S.D. Fla. 2000) ("The gag order, which purports to permanently enjoin . . . trial participants from discussing all aspects of the case . . . is unconstitutional on its faee."), *vacated as moot*, 256 F.3d 1251 (11th Cir. 2001).

This Court, too, has recognized that "a permanent bar on the NSL's disclosure" raises severe First Amendment problems and has indicated that such indefinite bans would not pass constitutional muster. *Doe v. Holder*, 665 F. Supp. 2d at 433 (citing *Doe v. Gonzales*, 449 F.3d at 422 ("A permanent ban on speech seems highly unlikely to survive the test of strict scrutiny, one where the government must show that the statute is narrowly tailored to meet a compelling government interest.") (Cardamone, J., concurring)).

What is particularly troubling about the present gag order is that there do not appear to be any circumstances under which the FBI would change its determination to enforce the gag order. In defending the present gag order, the FBI effectively claims unilateral power to enjoin the speech of private citizens for as long as it sees fit. Courts have rarely had occasion to review such a sweeping claim of censorial power. In the few instances in which they have even considered such a possibility, courts have expressed serious doubt about whether a prior restraint of this scope would be constitutionally permissible under any circumstances. Courts have resoundingly invalidated similar speech restrictions whenever they have been asked to review them. *See, e.g., Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 702-03 (1931) (finding unconstitutional a statute permitting courts to "enjoin perpetually" the printing of a "malicious, scandalous and defamatory newspaper"); *Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1306 (1983) (Brennan, Circuit Judge) (expressing doubt as to whether "any justification would suffice to sustain a permanent" injunction on speech). As the Supreme Court observed in *Butterworth*, "the potential for abuse of [an indefinite prior restraint], through its employment as a device to silence those who know of unlawful conduct or irregularities on the part of public officials, is apparent." 494 U.S. at 635-36.

### 2. The Prior Restraint Is a Content-Based Speech Restriction

The FBI's continuing gag must be subject to exacting judicial scrutiny for another reason: it constitutes a classic content-based restriction on speech. The FBI has singled out a specific category of speech—speech about the legal scope of the government's surveillance authority—for discriminatory and repressive treatment. "Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). This prohibition "extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic," such as what records NSLs demand. *Doe v. Ashcroft*, 334 F. Supp. 2d 471, 513 (S.D.N.Y. 2004) (quoting *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n*, 447 U.S. 530, 537 (1980)). "Content-based regulations" such as this one are therefore "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).[3]

The FBI's gag order categorically forbids Mr. Merrill from making a unique contribution to any discussion about the types of records the FBI seeks when it serves ISPs with NSLs. This prohibition on discussing an entire area of public policy is self-evidently content-based and must be subject to strict scrutiny. *See Doe v. Ashcroft*, 334 F. Supp. 2d at 512.

### 3. The Prior Restraint Suppresses Core Political Speech

The FBI's prior restraint must be subjected to the most exacting judicial scrutiny for the further reason that it prohibits truthful public discussion and political advocacy about

---

[3] While *John Doe, Inc.* distinguished the nondisclosure requirement of § 2709(c) from "a typical prior restraint or a typical content-based restriction," it made that determination in the context of a facial challenge to the statute in a posture where the plaintiff was forbidden from even identifying himself. 549 F.3d at 877. In the current as-applied challenge, where the government is solely targeting the contents of the Attachment precisely because of what the Attachment contains, there is no meaningful way to distinguish the gag order from a classic content-based restriction. Thus, while the panel in *John Doe, Inc.* was divided as to whether "in [that] context, we should examine subsection 2709(c) under a standard of traditional strict scrutiny," *id.* at 878, in the current context there is little doubt that strict scrutiny does indeed apply.

government activity, speech that is at the core of First Amendment protection. "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs," including "the manner in which government is operated or should be operated." *Mills v. Alabama*, 384 U.S. 214, 218-19 (1966). *See also, e.g., Buckley v. Valeo*, 424 U.S. 1, 93, n.127 (1976) (per curiam) ("[T]he central purpose of the Speech and Press Clauses was to assure a society in which uninhibited, robust, and wide-open public debate concerning matters of public interest would thrive, for only in such a society can a healthy representative democracy flourish.") (internal citations omitted); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (stressing the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open").

The FBI's indefinite gag order violates this core tenet of the First Amendment by preventing Mr. Merrill from discussing the breadth of the FBI's authority to secretly gather data about private citizens. Indeed, the gag order not only inhibits public debate on the wisdom or constitutionality of the NSL statute, but also prevents Mr. Merrill from shedding light on what the text of the NSL statute has actually *meant* in the hands of the FBI. Because no publicly available source clearly explains just what types of information the NSL statute permits the FBI to demand, the only way to understand just how broadly the FBI has construed its own surveillance authority is to look at the demands themselves. Suppressing the Attachment therefore serves to keep the very meaning of the law secret. But, as the Second Circuit has observed, "secret law is an abomination." *Caplan v. Bureau of Alcohol, Tobacco & Firearms*, 587 F.2d 544, 548 (2d Cir. 1978) (internal citations omitted). The First Amendment cannot tolerate a prior restraint that, in purpose and effect, hides from the public the manner in which

16

the government has interpreted a deeply contested statute. *Cf. N.Y. Times Co. v. United States*,

403 U.S. 713, 728 (1971) (Stewart, J., concurring) ("[T]he only effective restraint upon

executive policy and power in the areas of national defense and international affairs may lie in an

enlightened citizenry—in an informed and critical public opinion which alone can here protect

the values of democratic government.").

### B.     The Gag Order Cannot Survive Strict Scrutiny

The gag order is subject to the most exacting constitutional analysis and must be struck

down unless the government shows that the gag meets the heavy burden of strict scrutiny—*i.e.*,

that it is "narrowly tailored to serve a compelling government interest." *Doe v. Holder*, 665 F.

Supp. 2d at 433. The gag order cannot survive such rigorous review.

#### 1.     *The FBI Cannot Identify Any Compelling Interest that Supports Continuing the Prior Restraint*

Now that the investigation that generated the 2004 NSL has ended, the gag order

preventing Mr. Merrill from discussing the Attachment does not serve any compelling

government interest. Mr. Merrill is now permitted to publicly identify the target of the 2004 NSL

and all other facts specific to the investigation for which it was issued. The gag order on the

Attachment therefore cannot be justified with reference to that investigation because no

investigation is ongoing.

Presumably, the government will argue that the Attachment must be kept secret to

prevent the public from learning the type of information it believes it can demand using an NSL.

But courts have been rightly skeptical of the government's attempt to conceal the *meaning of* its

statutory surveillance authorities. In a case substantially similar to the present one, the Southern

District of Texas held that two federal statutes that prohibited telecommunications companies

from disclosing the content of "pen/trap" surveillance orders violated the First Amendment. The

court rejected the government's argument that an interest in protecting "sensitive investigative techniques" was sufficient to keep the scope of its record collection program secret, concluding that while "[m]uzzling telecoms to prevent disclosure of pen/trap orders might in the odd case deprive a fugitive of useful information," it "would also deprive the law-abiding public of significant data about the frequency of compelled Government access to individual e-mail and phone records." *In re Sealing & Non-Disclosure of Pen/Trap/2703(d) Orders*, 562 F. Supp. 2d 876, 886 (S.D. Tex. 2008). If "that sort of trade-off were legally acceptable, then the Government would he free to cloak in secrecy *any* investigative technique, from the most mundane search warrant to the most sophisticated electronic surveillance, thereby avoiding the disinfecting rays of public scrutiny." *Id.*

In addition, the government's conduct belies any claim that it has a compelling interest in keeping secret its understanding of the scope of its NSL authority. The government has already disclosed some of the very information it seeks to censor here. For instance, the Attachment's demands for ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ email address ▓▓▓▓▓▓▓▓▓▓▓▓▓ remain redacted.[4] Stip. and Order Mod. J., *Doe v. Holder*, No. 04-cv-2614 (S.D.N.Y. Apr. 15, 2014); Manes Decl. Ex. C. But the Department of Justice disclosed those categories in a December 23, 2002, letter to Senator Leahy that was published in a Senate Report. *See* Manes Decl. Ex. J. A March 2007 report issued by the Department of Justice's Office of the Inspector General likewise disclosed two of these three categories as well as the still-redacted category of "▓▓ billing ▓▓▓▓▓▓▓▓▓▓." *See* Manes Decl. Ex. K, at 10. The fact that the government has willingly disclosed these categories of ECTR—which are still

---

[4] The words "email address" in the quoted phrases are no longer subject to a nondisclosure order; all other words remain subject to the gag.
[5] The word "billing" is unredacted in the currently public version of the Attachment.

subject to the gag order at issue here—underscores that the government in truth has no compelling interest in keeping any of this kind of information secret.

## 2. The Ongoing Prior Restraint Is Not Narrowly Tailored

Likewise, the government cannot plausibly argue that its decade-long gag on Mr. Merrill is narrowly tailored to serve any sufficient government interest, for at least two reasons. As an initial matter, courts have consistently held that permanent or indefinite bans on speech are presumptively overbroad and unconstitutional. *See supra* Part I.A.1. Permitting the FBI to maintain a prior restraint on Mr. Merrill for over a decade, even after the gag order has become untethered from any ongoing investigation, impermissibly designates "a category of information, and thus a class of speech, that, for reasons not satisfactorily explained, must forever be kept from public view, cloaked by an official seal that will always overshadow the public's right to know." *Doe v. Ashcroft*, 334 F. Supp. 2d at 519. As already discussed, the First Amendment simply does not countenance permanent gags on protected speech. *See supra* Part I.A.1.

In addition, the gag is overly broad not only with respect to its duration, but also with respect to its scope. More particularly, imposing a gag on the categories of records the FBI regarded as ECTR in 2004 fails to serve any plausible national security purpose. This is because all of the categories of information demanded in the Attachment can be obtained by the government in national security investigations through means other than NSLs, such as FISA court orders.[6] It is therefore no secret that the government can obtain the types of information

---

[6] Section 215 of the Patriot Act (also known as Section 501 of the Foreign Intelligence Surveillance Act), permits the FBI to "make an application for an order requiring the production of any tangible things (including books, records, papers, documents, and other items) for an investigation to obtain foreign intelligence information . . . or to protect against international terrorism or clandestine intelligence activities . . . ." 50 U.S.C. § 1861. No one doubts that the government could demand all of the information described in the Attachment provided it followed the additional procedural safeguards required by Section 215. *See also* 18 U.S.C. § 2703 (specifying procedures for disclosure of electronic records); Manes Decl.

discussed in the Attachment. Accordingly, the gag order here serves only to prevent the public from knowing that the FBI believed it could request the information in the 2004 Attachment *using an NSL*. This information is of great importance to the public, because, as construed by the FBI in secret, NSLs permit the government to obtain a variety of sensitive information without any prior judicial oversight upon a mere showing of "relevance." But disclosure of this fact would not cause any harm because targets of government scrutiny surely already understand that all electronic records may be obtained using one legal authority or another.

## II.    EVEN UNDER THE LOWER STANDARD APPLIED IN *JOHN DOE, INC. V. MUKASEY*, THE FBI'S GAG ORDER CANNOT BE JUSTIFIED

Even if the gag survives (or is not subject to) strict scrutiny, the Court should still set aside the gag order under the standard of review articulated in *John Doe, Inc*. There, the Court of Appeals construed the statute to "place on the Government the burden to persuade a district court that there is a good reason to believe that disclosure may result in one of the enumerated harms" and that such harms are "related to an authorized investigation to protect against international terrorism or clandestine intelligence activities." 549 F.3d at 876 (internal quotations omitted).

While this Court previously upheld the gag order imposed on Mr. Merrill under the *John Doe, Inc.* standard, the facts have since changed. At that time, Mr. Merrill was permitted to identify neither himself nor the NSL's target because the investigation that generated the NSL was still ongoing. *See John Doe, Inc.*, 549 F.3d at 865. Because the nondisclosure order is now untethered from any "authorized investigation," the government cannot show any harm sufficient to satisfy the statute, as construed by the Court of Appeals. This Court's 2009 order approving the continuation of the gag order, *Doe v. Holder*, 665 F. Supp. 2d at 426, was likewise predicated on the key fact that the FBI's investigation at the time was still "ongoing," *Doe v. Holder*, 640 F.

---

Ex. L, at 222-23 (sample § 2703(d) order demanding many of the same types of records listed in the 2004 Attachment).

Supp. 2d 517, 518 (S.D.N.Y. 2009) (stating that the government's declaration in support of the gag order "describe[d] an ongoing authorized investigation to protect against international terrorism or clandestine intelligence activities").

Because the investigation of which the 2004 NSL was part is now, evidently, closed, the government's continued gag prohibiting Mr. Merrill from discussing the types of records sought in that NSL can now be justified only based on the FBI's desire to suppress general discussion of the scope of its claimed authority. That purpose is not recognized as a basis to impose gag orders, even under *John Doe, Inc.* Moreover, *John Doe, Inc.* recognized that even where an authorized investigation exists—which is not the case here—the government must make a showing of "good reason" in order to sustain a gag. 549 F.3d at 875. For the same reasons articulated above, *supra* Part I.B., there is no "good reason" for the gag order that continues to bind Mr. Merrill.

## III. THE NSL STATUTE DOES NOT AUTHORIZE THE FBI'S ONGOING GAG ON MR. MERRILL'S SPEECH

The statutory regime that governs the FBI's authority to issue NSLs, 18 U.S.C. §§ 2709 and 3511, permits the FBI to issue a nondisclosure order only in conjunction with a specific, authorized, and ongoing investigation. Because the underlying investigation that initiated Mr. Merrill's NSL has concluded, the FBI's statutory authority to prevent Mr. Merrill from speaking about the Attachment has been exhausted, and this Court should set aside the gag order.

While this understanding of the statute is required by its plain meaning, even if the Court finds ambiguity in the statute, the Court should adopt this construction of the statute in order to avoid deciding the constitutionality of imposing a permanent gag on speech that is entirely untethered from the specific investigation that initially justified it.

21

## A.   The Statute's Nondisclosure Provision Only Protects the Integrity of a Specific, Ongoing Investigation

The NSL statute, by its terms, only authorizes the FBI to order an NSL recipient not to disclose "that the [FBI] has sought or obtained access to information or records under this section." 18 U.S.C. § 2709(c)(1). The surrounding language in the statute, as well as in the accompanying provision for judicial review, 18 U.S.C. § 3511, indicate that this authority should be understood to permit nondisclosure orders only when revealing the existence of an NSL would threaten the *particular* "authorized investigation" that the NSL was issued to advance. 18 U.S.C. § 2709(b)(1)-(2). Construed in this way, the NSL nondisclosure provision allows the FBI to maintain the secrecy and integrity of a particular investigation by preventing an NSL recipient from tipping off the NSL's target (or anyone else) that the FBI has "sought or obtained access" to records. But it does not grant the FBI unbridled authority to issue gag orders to NSL recipients even after the particular investigation is over and where, as here, the government has conceded that the NSL recipient may publicly disclose not only that the FBI has, indeed, "sought . . . access" to records but also whom the FBI was seeking records about.

A number of features of the statute compel this interpretation. First, by its terms, the statute creates a "prohibition of *certain* disclosure" related to an NSL—not any disclosure. 18 U.S.C. § 2709(c) (emphasis added). It then clarifies that the "certain" disclosure the FBI may prohibit is the fact that the FBI has "sought or obtained access to information or records." 18 U.S.C. § 2709(c)(1). The FBI's authority to seek records depends on a certification of relevance to "an authorized investigation." 18 U.S.C. § 2709(b)(1)-(2). Likewise, the FBI's derivative authority to issue a gag—and to hide the fact that it sought records—also depends on the existence of that investigation. 18 U.S.C. § 3511(b)(1). That is to say, the gag may only be ordered against "[t]he recipient of a request for records . . . in connection with such a request."

18 U.S.C. § 3511(b)(1). The most natural reading of this language is one that constrains the FBI's nondisclosure authority to the context of a specific "authorized investigation," not one that permits gag orders to persist so long as *any* authorized investigation happens to remain ongoing.[7]

This understanding of the limits on the FBI's nondisclosure authority is further supported by the four specific, enumerated justifications the statute provides for imposing and sustaining a gag order. 18 U.S.C. § 3511(b)(2)-(3). A gag order may only be justified if disclosure may "endanger the national security of the United States, interfere with a criminal, counterterrorism, or counterintelligence investigation, interfere with diplomatic relations, or endanger the life or physical safety of any person." 18 U.S.C. § 3511(b). All four justifications relate to harms that flow from disclosing the existence of a *particular* investigation; none speak in terms of harms that would result from disclosure of the manner in which the FBI has used NSLs *in general* or from disclosure of the scope of the FBI's claimed authority.

Indeed, had Congress wished to authorize the FBI to impose a gag order long after the close of a particular investigation, solely to protect from disclosure the scope of its claimed authority, it could have said so explicitly. Congress is fully capable of authorizing this type of nondisclosure when it intends to do so, as it has done explicitly elsewhere in the U.S. Code. *See, e.g.*, 50 U.S.C. § 3507 (providing that the Director of National Intelligence "shall be responsible for protecting intelligence sources and methods from unauthorized disclosure"); 50 U.S.C. § 3024(i)(1) (requiring the Director of National Intelligence to "protect intelligence sources and

---

[7] Neither this Court nor the Second Circuit has yet had occasion to reach this interpretive question regarding the scope of the FBI's authority under the statute. The last time this Court considered the NSL statute, the government contended that revealing Mr. Merrill as the recipient of the NSL could harm an active investigation. *Doe v. Holder*, 665 F. Supp. 2d 426, 431 (S.D.N.Y. 2009). Now that Mr. Merrill can reveal himself as the recipient and his client as the target, the gag no longer functions to protect the investigation that gave rise to it. Only in these circumstances—where an NSL recipient has been permitted to identify himself and the target of the NSL—does the statutory distinction drawn here become relevant.

23

methods from unauthorized disclosure"); 5 U.S.C. § 552(b)(7)(E) (exempting from disclosure under the Freedom of Information Act information that would disclose "techniques," "procedures," or "guidelines for law enforcement investigations or prosecutions").

The current gag order forbidding disclosure of the Attachment to the 2004 NSL falls outside the scope of the FBI's statutory nondisclosure authority. Once Mr. Merrill was permitted to publicly disclose both the fact that he received an NSL and the identity of the target of that NSL, the gag order could no longer be justified in order to protect the particular investigation in connection with which the NSL was issued. There is simply no roving authority in the statute to impose indefinite gag orders long after an investigation ends and after, as the government freely concedes, disclosure of the NSL's existence and the identity of its target would cause no harm.[8]

In 2010, this Court recognized that the litigation involved "an ongoing investigation involving suspected terrorist activities." *Doe v. Holder*, 703 F. Supp. 2d 313, 317 (S.D.N.Y. 2010). The ongoing investigation provided the basis for the continued gag. *Id.* But it is now clear that the underlying investigation has ended. The FBI has permitted Mr. Merrill to disclose that the FBI requested records with an NSL, that Mr. Merrill was the recipient of the NSL, the identity of the target of the NSL, and whether the FBI actually obtained records. In short, the FBI has allowed Mr. Merrill to disclose all information that related to the specific, ongoing investigation described in 2010 as the basis for the gag, and it therefore has no statutory basis for continuing to restrict his speech.

---

[8] Under this interpretation of the statute, the FBI is of course permitted to prevent disclosure of the Attachment to the extent necessary to avoid disclosure of the fact that the FBI "sought or obtained" information from a particular NSL recipient or about a specific target. Thus, if the FBI is justified in ordering an NSL recipient not to disclose the fact that he received of an NSL, it may of course prevent that recipient from disclosing the contents of the Attachment because doing so would necessarily reveal that he had received an NSL. But where, as at this stage in Mr. Merrill's case, an NSL recipient can disclose not only that information was "sought or obtained" but also to whom that information pertained, the FBI's authority to impose nondisclosure obligations has been exhausted.

24

**B.     An Interpretation of the Statute That Permits the Gag Order to Continue
Indefinitely Would Raise Serious Constitutional Questions That This Court
Can and Should Avoid**

Any interpretation permitting the indefinite continuation of Mr. Merrill's gag order would

raise serious constitutional problems. *See supra* Part I. While Mr. Merrill contends that the

statute unambiguously fails to authorize the present gag order, if this Court concludes that the

statute is ambiguous in this regard, the Court can and should avoid ruling on the unconstitutional

implications of the FBI's interpretation of the statute by adopting the construction proposed

above. The Supreme Court has instructed that, where one construction of a statute "would raise

serious constitutional problems" and another interpretation is "fairly possible," a court is

"obligated to construe the statute to avoid such problems." *INS v. St. Cyr,* 533 U.S. 289, 299-300

(2001); *see also FCC v. Fox TV Stations, Inc.,* 556 U.S. 502, 516 (2009) ("[C]onstitutional

avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to

avoid serious constitutional doubts."); *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 507

(1979) (declining to construe a statute "in a manner that could in turn call upon the Court to

resolve difficult and sensitive questions arising out of the guarantees of the First Amendment" in

the absence of a clear expression of congressional intent). Mr. Merrill's construction of the

statute is surely "fairly possible," and permitting the FBI to maintain the gag order would not

only "raise serious constitutional questions," it would in fact violate the First Amendment. *See*

*supra* Part I, II. Relying on the doctrine of constitutional avoidance is appropriate in this case,[9]

and this Court should hold that the statute only allows a continued gag order when tethered to a

specific, ongoing investigation. Because the investigation that gave rise to Mr. Merrill's gag has

closed, that gag should be lifted.

---

[9] This Court would not be the first to rely on this canon of statutory construction to save this statute from
constitutional problems. *See John Doe, Inc. v. Mukasey,* 549 F.3d 861 (2d Cir. 2008) (adopting a
narrowing construction 18 U.S.C. § 2709(c) to avoid First Amendment problems).

## CONCLUSION

For the foregoing reasons, Nicholas Merrill is entitled to judgment as a matter of law, his motion for summary judgment should be granted, and the prior restraint should be lifted in full.

Respectfully submitted,

Jonathan Manes, supervising attorney
David A. Schulz, supervising attorney
Benjamin Graham, law student intern
Matthew Halgren, law student intern
Nicholas Handler, law student intern
Amanda Lynch, law student intern
MEDIA FREEDOM AND INFORMATION
  ACCESS CLINIC
YALE LAW SCHOOL[10]
P.O. Box 208215
New Haven, CT 06520
Tel: (203) 432-9387
Fax: (203) 432-3034
jonathan.manes@yale.edu

March 10, 2015

---

[10] The Media Freedom and Information Access Clinic is a program of the Abrams Institute for Freedom of Expression at Yale Law School. This Memorandum does not purport to present the school's institutional views, if any.