UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NICHOLAS MERRILL,

                Plaintiff,

    v.

ERIC HOLDER, Jr., in his official capacity as
Attorney General of the United States, and
JAMES B. COMEY, in his official capacity as
Director of the Federal Bureau of Investigation,

                Defendants.

14 CIV. 09763 (VM)

~~SEALED~~

---

## DECLARATION OF JONATHAN MANES

I, Jonathan Manes, hereby declare:

1.   I am a supervising attorney and Clinical Lecturer in the Media Freedom and Information Access Clinic at Yale Law School (the "MFIA Clinic"), which represents Nicholas Merrill in the above captioned litigation. Mr. Merrill seeks to end the gag order under which he was placed when he received a national security letter in 2004 (the "2004 NSL") from the FBI ordering him to disclose information about a customer.

2.   That gag order, as modified by *Doe v. Holder*, 703 F. Supp. 2d 313 (S.D.N.Y. 2010), and two subsequent court-ordered stipulations, currently forbids Mr. Merrill from speaking about most of the contents of an attachment to the 2004 NSL ("Attachment") that specifies categories of information that the FBI regarded as "electronic communication transactional records" and which the FBI sought to compel him to disclose. The current scope of the gag order is set forth in the Stipulation and Order entered on April 15, 2014, in *John Doe, Inc. v. Holder*, No. 04-cv-2614 (VM) (S.D.N.Y.), a true and correct copy of which is attached hereto as Exhibit A.

***Negotiations in 2014 to Lift the Gag Order***

   3.   On January 15, 2014, before commencing this litigation, a law student intern in the MFIA Clinic, acting under my supervision and on Mr. Merrill's behalf, contacted defendants' counsel via email to request that the FBI lift, in its entirety, the gag order to which Mr. Merrill remained subject. A true and correct copy of this email is attached hereto as Exhibit B.

   4.   The scope of the gag order in place at that time was set forth in a Stipulation and Order entered on July 30, 2010 in *John Doe, Inc. v. Holder*, No. 04-cv-2614 (VM) (S.D.N.Y.). A true and correct copy of the order is attached hereto as Exhibit C.

   5.   On February 2, 2014, having not received a substantive response, the same student sent another email asking whether the FBI would drop the gag order. The email noted that in the time since the MFIA Clinic's prior correspondence, the President had delivered a speech specifically directing "the Attorney General to amend how [the government] uses National Security Letters so that this secrecy will not be indefinite, so that it will terminate with a fixed time unless the government demonstrates a real need for further secrecy." The email noted that Mr. Merrill had, at that time, been subject to a gag order for more than ten years. A true and correct copy of this email is attached hereto as Exhibit D.

   6.   On February 12, 2014, I participated in a telephone conference with Benjamin Torrance, counsel for the defendants in this action, to discuss Mr. Merrill's request that the gag order be lifted in full. Mr. Torrance stated that the FBI would agree to drop the nondisclosure order in its entirety with one important exception: the FBI would not agree to lift the nondisclosure order with respect to the non-public contents of the Attachment and would insist that it remain subject to a nondisclosure requirement to the same extent as following the Court's decision in *Doe v. Mukasey*, 703 F. Supp. 2d 313 (S.D.N.Y. 2010). Mr. Merrill would be free,

however, to speak publicly about everything else relating to the NSL, including the identity of the person who was the target of the 2004 NSL.

7.  On the February 12, 2014, telephone call, Mr. Torrance represented that the FBI did not anticipate agreeing to lift the nondisclosure order with respect to the Attachment in the foreseeable future.

8.  On April 11, 2014, the parties signed a stipulation and proposed order modifying the nondisclosure order in accordance with the FBI's position, described above.  The Court endorsed the order on April 15, 2014.  *See* Exhibit A.

9.  The stipulation and proposed order specifically preserved Mr. Merrill's right to challenge the lawfulness of the continuing nondisclosure obligation.

10. Based on the representations of opposing counsel, the contents of the stipulation and order, and the fact that the FBI has conceded that Mr. Merrill may publicly disclose the target of the 2004 NSL and may discuss the 2004 NSL with its target, it is clear that the specific investigation that prompted the 2004 NSL is now closed.  It is equally clear that the government intends to keep the current nondisclosure order in place permanently or indefinitely, its duration untethered from any considerations specific to the investigation that prompted the 2004 NSL.

*Widespread Use of National Security Letters and the Attachment*

11. The FBI appears to have sent attachments like the Attachment to many NSL recipients.  The FBI's General Counsel sent a memorandum in 2001 to its field offices explaining how to issue NSLs.  In that memorandum, the General Counsel wrote, "The Model NSLs for financial records and electronic communication transactional records each have a separate attachment.  These attachments provide examples of information which the company

3

might consider to be financial or electronic communication transactional records." A true and correct copy of that memorandum is attached hereto as Exhibit E.

12. Tens of thousands of National Security letters are issued every year. Hundreds of thousands have been issued since 2001. A report issued by the Department of Justice's Office of the Inspector General states that the number of NSLs the FBI issued in the years 2003 through 2011 is as follows: 2003: 39,346; 2004: 56,507; 2005: 47,221; 2006: 49,425; 2007: 39,403; 2008: 41,299; 2009: 30,442; 2010: 54,935; 2011: 46,648. A true and correct excerpt of this report, issued in August 2014 and entitled *A Review of the Federal Bureau of Investigation's Use of National Security Letters: Assessment of Progress in Implementing Recommendations and Examination of Use* is attached hereto as Exhibit F.

13. In 2013, the FBI issued 19,212 National Security Letters, which comprised 38,832 requests for information, according to the Office of the Director of National Intelligence's report entitled *Statistical Transparency Report Regarding the Use of National Security Authorities: Annual Statistics for Calendar Year 2013*. A true and correct copy of this report is attached hereto as Exhibit G.

14. Tens of thousands of National Security Letters seek disclosure of information about U.S. citizens and lawful permanent residents. In 2013 alone, the FBI made 14,219 requests for information concerned U.S. persons and sought information pertaining to 5,334 different individuals, according to a report from the Department of Justice to Congress dated April 30, 2014. In 2012, the FBI made 15,229 NSL requests pertaining to 6,223 different individuals, according to a similar report from the Department of Justice to Congress dated April 30, 2013. True and correct copies of these reports are attached as Exhibit H.

*Official Government Discussion Regarding the Scope of the FBI's NSL Authority*

15.  In 2008, the Office of Legal Counsel ("OLC") issued a memorandum addressing aspects of the FBI's authority to compel wire or electronic communications service providers to produce records under 18 U.S.C. § 2709.  That memorandum did not detail the scope of the FBI's authority to order disclosure of "electronic communications transaction records" ("ECTR") from electronic service providers.  However, in a footnote, the memorandum indicated that the ECTR reaches "those categories of information parallel to subscriber information and toll billing records for ordinary telephone service."  The OLC memo does not specify what "categories of information" maintained by electronic service providers are "parallel to" ordinary toll billing records.  The analogy drawn by the OLC between electronic records and ordinary telephone billing records is not particularly illuminating given the great variety of electronic services and the substantial technological and logistical differences between such services and traditional telephone billing.  A true and correct copy of the OLC's memorandum is attached hereto as Exhibit I.

16. To the best of my knowledge, no statute, regulation, judicial opinion, public administrative guidance, or other public document enumerates all of the categories of information that the FBI believes it is authorized to collect as ECTR under 18 U.S.C. § 2709.  Neither has any individual recipient of an NSL disclosed the categories of ECTR demanded by the FBI in an NSL.

17. The government has already acknowledged that it uses NSLs to request some of the categories of information described in the suppressed portions of the Attachment.  For example, in response to questions from Senator Patrick Leahy in 2002, the Deputy Attorney General submitted a written response stating that "NSLs can be served on Internet Service Providers to

obtain information such as"                                                                    

These categories nevertheless remain subject to the nondisclosure

order.  The Deputy Attorney General's response was attached to a cover letter from Assistant

Attorney General Daniel J. Bryant to Senator Leahy dated December 23, 2002.  It was

subsequently was reprinted as an appendix to a Senate Report, S. Rep. No. 108-40, 89-90 (2003).

A true and correct copy of the response and accompanying cover letter is attached here as

Exhibit J.

        18. Similarly, a March 2007 Report from Department of Justice's Office of the Inspector

General, states, at page 10, that the "type of information the FBI can obtain through national

security letters includes" "email addresses associated with the account" and "screen names."

These categories remain redacted or partially redacted from the public version of the Attachment

under the current nondisclosure order.  The March 2007 Report also states that NSLs may be

used to obtain "billing records and methods of payment," types of information that appear to be

encompassed by categories that remain suppressed in the Attachment. A true and correct excerpt

from the report, entitled *A Review of the Federal Bureau of Investigation's Use of National

Security Letters* (March 2007), is attached as Exhibit K.

        19. A manual published by the DOJ's Office of Legal Education provides a sample

attachment that may be appended to a disclosure order issued pursuant to 18 U.S.C. § 2703,

listing the categories of records sought pursuant to such an order.  Many of the categories of

records listed in that sample attachment are very similar to those listed in the Attachment to the

2004 NSL.  A true and correct excerpt of that manual is attached hereto as Exhibit L.

### *Public Controversy and Political Debate Regarding NSLs*

20. Knowing what kind of information the FBI attempts to obtain through NSLs is essential to the public debate over the proper use of NSLs, which has been ongoing for many years. Numerous news articles have reported on public controversy regarding NSLs over more than a decade. To take but one early example, in 2005 the *Washington Post* published a lengthy article describing the government's use of NSLs and detailing public opposition to their use and abuse. A true and correct copy of that article, Barton Gellman, *The FBI's Secret Scrutiny*, Wash. Post, Nov. 6, 2005, is attached hereto as Exhibit M.

21. Mr. Merrill has received public recognition for his advocacy regarding NSLs. For instance, in 2007, Mr. Merrill received the Roger Baldwin Medal of Liberty from the American Civil Liberties Union, and, in 2012, he received a Patriot Award from the Bill of Rights Defense Committee.

22. Many news reports regarding the public controversy over the FBI's NSL program have featured Mr. Merrill. Attached hereto as Exhibits N, O, and P are true and correct copies of three such articles: Jennifer Valentino-Devries, *What It's Like to Fight a National Security Letter*, Wall St. J., July 17, 2012; Noam Cohen, *Twitter Shines a Spotlight on Secret F.B.I. Subpoenas*, N.Y. Times, Jan. 9, 2011; and Kim Zetter, *'John Doe' Who Fought FBI Spying Freed From Gag Order After 6 Years*, Wired, Aug. 10, 2010.

23. The public's interest in knowing how the government uses its NSL authority is particularly strong given the FBI's past abuses of this program. In March 2007, the Department of Justice's Office of the Inspector General released a lengthy report cataloging a variety of abuses of the program, which included NSLs issued in connection with lapsed investigations and

e-mail transactional information obtained without ties to a relevant, authorized investigation. A true and correct excerpt of that report is attached hereto as Exhibit K.

24. The public has become particularly interested in and concerned with the scope of the government's claimed surveillance authorities—including NSLs—following the disclosures that began in the summer of 2013 regarding various intrusive surveillance programs, including the government's bulk collection of domestic telephone records pursuant to Section 215 of the Patriot Act. Under Section 215, the Foreign Intelligence Surveillance Court authorized the government to engage in bulk collection of domestic telephone records on the theory that all such "business records" were "relevant" to a counterterrorism investigation and therefore subject to disclosure. *See* Klayman v. Obama, 957 F. Supp. 2d 1, 14-19 (D.D.C. 2013) (recounting the government's description of the program).

25. In response to these disclosures and the resulting public attention, the President announced the creation of a Review Group on Intelligence and Communications Technologies ("Review Group") to study the government's surveillance authorities, including in particular the privacy and civil liberties concerns they raise.

26. In December 2013, the Review Group issued its report, which recommended significant reforms to the NSL gag order regime. The Review Group's report devoted an entire section to National Security Letters, describing them as "highly controversial" and recounting the history of "extensive misuse of the NSL authority." The Review Group report, at page 89, recommended significant reforms to the NSL authority, including that the statute be amended to permit the issuance of NSLs only with prior judicial authorization. The Review Group report, at pages 122-23, also recommended major changes to the secrecy provisions of the NSL statute, including that nondisclosure orders should be subject to initial judicial authorization and frequent

8

automatic judicial review. The Review Group also specifically recommended that all NSL recipients should be permitted to disclose "the general categories of information they have produced." A true and correct excerpt of the Review Group's report is attached hereto as Exhibit Q.

27. The disclosure of the government's bulk collection program has spurred significant public recognition and concern that government collection of ostensibly "non-content" data (or "metadata") can be highly intrusive. A recent amicus brief filed by a group of leading computer and data scientists in an appeal pending in the Court of Appeals for the Ninth Circuit highlights how these concerns about metadata apply to NSLs. The experts explain both their understanding of the breadth of the FBI's authority to surveil Americans, and the deeply sensitive information that NSL data reveal. Brief Amicus Curiae of Experts in Computer Science and Data Science in Support of Appellants, *Under Seal v. Holder*, Nos. 13-15957 & 13-16731 (9th Cir. filed Apr. 1., 2014). A true and correct copy of the brief is attached hereto as Exhibit R.

**The Government's Recent Commitments to End Indefinite Gag Orders on NSL Recipients**

28. On January 17, 2014, after the Review Group issued its report, President Obama gave a speech in which he pledged to reduce the secrecy surrounding NSLs, stating that "we can and should be more transparent in how Government uses this authority." In the speech, the President "directed the Attorney General to amend how we use national security letters so that this secrecy will not be indefinite." A true and correct copy of the text of this speech is attached hereto as Exhibit S.

29. On February 3, 2015, the Office of the Director National Intelligence issued its Signals Intelligence Reform 2015 Anniversary Report. In a section devoted to National Security Letters, the report stated that "in response to the President's new direction," announced in his

January 17, 2014, remarks, "the FBI will now presumptively terminate National Security Letter nondisclosure orders at the earlier of three years after the opening of a fully predicated investigation or the investigation's close." The report went on to indicate that "continued nondisclosure orders beyond this period" are permitted only if a designated official "has justified, in writing, why the continued nondisclosure is appropriate." A true and correct copy that announcement is attached hereto as Exhibit T.

30. Despite the President's remarks and the formally stated policy of the government against indefinite gag orders, Mr. Merrill still remains subject to a nondisclosure order more than eleven years after it was first imposed.


I declare under penalty of perjury that the foregoing is true and correct. Executed on this 10th day of March, 2015, at New Haven, CT


_____
Jonathan Manes