UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

NICHOLAS MERRILL,

                Plaintiff,

      v.

ERIC HOLDER, JR. et al.,

                Defendants.

———————————————————————— x

14 Civ. 9763 (VM)

**Memorandum of Law in Support of the Government's Motion
to Dismiss or for Summary Judgment, and in Opposition to
Plaintiff 's Motion for Summary Judgment**

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street
New York, New York 10007
Telephone: 212.637.2703
Fax: 212.637.2702
E-mail: benjamin.torrance@usdoj.gov

BENJAMIN H. TORRANCE
Assistant United States Attorney

    – Of Counsel –

**Table of Contents**

Preliminary Statement ............................................................................................................ 1

Statement of Facts ................................................................................................................. 1

    A.   Background ........................................................................................................... 1

        1.   National Security Letters ................................................................................ 1

        2.   Confidentiality of National Security Letters .................................................. 3

        3.   Confidentiality of the Attachment ................................................................. 5

    B.   Merrill's Challenges to NSLs' Nondisclosure Requirements ................................ 6

        1.   The *John Doe, Inc.* Litigation ......................................................................... 6

        2.   Merrill's Current Lawsuit .............................................................................. 9

Argument .............................................................................................................................. 10

    A.   A Nondisclosure Requirement Is Justified Under Any Level of Scrutiny ........... 11

        1.   The Government Has a Compelling Interest in the Nondisclosure Requirement ......... 11

        2.   Nondisclosure of the Attachment Is Narrowly Tailored to Serve the Government's Interest ............................................................................................................... 15

    B.   *John Doe, Inc.*'s Analysis Governs Here ........................................................... 20

Conclusion ........................................................................................................................... 25

## Table of Authorities

*Cases*:

*Black v. Sheraton Corp.*,
564 F.2d 531 (D.C. Cir. 1977) ................................................................. 19

*Borchers v. Commercial Union Assur. Co.*,
874 F. Supp. 78 (S.D.N.Y. 1995) ............................................................. 19

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ................................................................................. 11

*Brodsky v. NRC*,
No. 09 Civ. 10594, 2015 WL 1623824 (S.D.N.Y. Feb. 26, 2015) ........... 2

*Brooklyn Legal Services v. Legal Services Corp.*,
462 F.3d 219(2d Cir. 2006) ..................................................................... 21

*Center for National Security Studies v. DOJ*,
331 F.3d 918 (D.C. Cir. 2003) ................................................................. 15

*CIA v. Sims*,
471 U.S. 159 (1985) ................................................................................... 9

*In re City of New York*,
607 F.3d 923 (2d Cir. 2010) ............................................................... 13, 18

*Department of Navy v. Egan*,
484 U.S. 518 (1988) ................................................................................. 11

*Earth Pledge Foundation v. CIA*,
128 F.3d 788 (2d Cir. 1997), *aff'g* 988 F. Supp. 623 (S.D.N.Y. 1996) ....... 14

*First Amendment Coalition v. Judicial Inquiry & Review Bd.*,
784 F.2d 467 (3d Cir. 1986) ( ................................................................... 12

*Fitzgibbon v. CIA*,
911 F.2d 755 (D.C. Cir. 1990) ................................................................. 14

*Frankel v. SEC*,
460 F.2d 813 (2d Cir. 1972) ..................................................................... 18

*In re Grand Jury Proceedings*,
776 F.2d 1099 (2d Cir. 1985) ................................................................... 12

*Haig v. Agee*,
453 U.S. 280 (1981) ................................................................................. 11

*Hoffman Pugh v. Keenan*,
338 F.3d 1136 (10th Cir. 2003) ............................................................... 12

*John Doe, Inc. v. Holder*,
665 F. Supp. 2d 426 (S.D.N.Y. 2009) ........................................... 7, 8, 13, 24

*John Doe, Inc. v. Holder*,
703 F. Supp. 2d 313 (S.D.N.Y. 2010) ............................................. 8, 9, 19

*John Doe, Inc. v. Mukasey,*
 549 F.3d 861, 883 (2d Cir. 2009)............................................................. *passim*

*Kamasinski v. Judicial Review Council,*
 44 F.3d 106 (2d Cir. 1994)......................................................................... 12

*Morrissey v. City of New York,*
 171 F.R.D. 85 (S.D.N.Y. 1997) ................................................................. 19

*Nat'l Cong. for Puerto Rican Rights ex rel. Perez v. City of New York,*
 194 F.R.D. 88 (S.D.N.Y. 2000) ................................................................. 18

*Salisbury v. United States,*
 690 F.2d 966 (D.C. Cir. 1982) ................................................................... 14

*Sams v. Yahoo! Inc.,*
 713 F.3d 1175 (9th Cir. 2013) ..................................................................... 3

*Sanitation & Recycling Indus., Inc. v. City of New York,*
 107 F.3d 985 (2d Cir. 1997)........................................................................ 12

*In re Sealing and Non-Disclosure of Pen/Trap/2703(d) Orders,*
 562 F. Supp. 2d 876 (S.D. Tex. 2008) ....................................................... 13

*Snepp v. United States,*
 444 U.S. 507 (1980)............................................................................. 11, 15

*United States v. Scopo,*
 861 F.2d 339 (2d Cir. 1988)........................................................................ 12

*Weisberg v. DOJ,*
 489 F.2d 1195(D.C. Cir. 1973) ................................................................... 18

*Wilson v. CIA,*
 586 F.3d 171 (2d Cir. 2009)........................................................................ 14

*Statutes*:

18 U.S.C. § 2709 ..................................................................................... *passim*

18 U.S.C. § 3511 ..................................................................................... *passim*

*Executive Orders*:

Exec. Order No. 12,333 .................................................................................. 1

Executive Order 13,526 .................................................................................. 2

**Preliminary Statement**

Defendants, the Attorney General and the Director of the Federal Bureau of Investigation, respectfully submit this memorandum of law in support of their motion to dismiss or for summary judgment, and in opposition to plaintiff Nicholas Merrill's motion for summary judgment.

Merrill attempts to reverse this Court's previous ruling that the First Amendment does not permit him to disclose sensitive law-enforcement information, the revelation of which would compromise the FBI's investigatory abilities. To do so, he seeks to change the standard of review announced by the Second Circuit in his own case, despite the fact that the court of appeals considered the interests he now asserts and factored them into the test it held to apply to review of nondisclosure requirements under 18 U.S.C. § 2709. And he argues that the nondisclosure requirement is permanent, ignoring the FBI's repeated willingness to reduce the requirement's scope to reflect changed circumstances, and ignoring the statutory mechanism for regular judicial review of nondisclosure requirements relied on by both the Second Circuit and this Court in denying Merrill's 2010 request. In sum, Merrill's application to overturn the nondisclosure requirement fails for the same reason his application failed in 2010. Judgment should accordingly be entered for the government.

**Statement of Facts**

**A.   Background**

**1.   National Security Letters**

The FBI has primary authority for conducting counterintelligence and counterterrorism investigations in the United States. *See* Exec. Order No. 12,333 §§ 1.14(a), 3.4(a), 46 Fed. Reg 59941 (Dec. 4, 1981). The FBI is engaged in extensive investigations into threats, conspiracies,

and attempts to perpetrate terrorist acts and foreign intelligence operations against the United

States and its interests abroad. These investigations are typically long-range, forward-looking,

and prophylactic, seeking to anticipate and disrupt clandestine intelligence activities or terrorist

attacks on the United States before they occur. (Decl. of Gary Douglas Perdue dated Apr. 23,

2015 ("Perdue Decl.") ¶¶ 9-13).[1]

   The FBI's experience with counterintelligence and counterterrorism investigations has

shown that electronic communications play a vital role in advancing terrorist and foreign

intelligence activities and operations. Accordingly, pursuing and disrupting terrorist plots and

foreign intelligence operations often require the FBI to seek information relating to the electronic

communications of particular individuals, from which it develops leads, determines a suspect's

associates and financial dealings, and applies for warrants to conduct further searches. The

information can also be used to clear individuals of suspicion. (Perdue Decl. ¶¶ 9-13).

   The statutory provision principally at issue in this case, 18 U.S.C. § 2709, was enacted in

1986 to assist the FBI in obtaining such information, permitting it to issue a type of

administrative subpoena known as a national security letter, or NSL. Section 2709 authorizes the

FBI to request "subscriber information and toll billing records information, or electronic

---

[1]    The Perdue Declaration is partly classified as national security information pursuant to
Executive Order 13,526, 75 Fed. Reg. 707 (2010), and the unclassified portions contain facts
designated by the FBI as "law enforcement sensitive" and accordingly filed under seal. Because
the Perdue Declaration contains all the relevant facts asserted by the government in this matter,
the government respectfully requests that the Court accept that declaration in place of a statement
of undisputed facts pursuant to Local Rule 56.1. Generating a Rule 56.1 statement from a
classified declaration would merely result in a second classified document, decreasing
transparency and increasing logistical difficulties for the Court and the parties, with no apparent
benefit (in particular, because the government's statement of facts is already contained in a
single document). *Brodsky v. NRC*, No. 09 Civ. 10594, 2015 WL 1623824, at *3 (S.D.N.Y. Feb.
26, 2015) (Rule 56.1 statement not required when discovery not requested and "record before the
Court is complete and appropriate for a summary judgment ruling"). However, if the Court
disagrees, the government will file a formal Rule 56.1 statement on request.

communication transactional records," § 2709(a), (b), all of which Congress deemed to be "less private than other records," *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1180 (9th Cir. 2013). But NSLs may not be used to seek the content of any wire or electronic communication. *See* S. Rep. No. 99-541 at 44 (1986), *reprinted in* 1986 USCCAN 3555, 3598; (Perdue Decl. ¶ 11). Before an NSL is issued, the FBI Director or a designee "not lower than Deputy Assistant Director at Bureau headquarters or a Special Agent in Charge in a Bureau field office" must certify that the information sought is "relevant to an authorized investigation to protect against international terrorism or clandestine intelligence activities." § 2709(b)(1)-(2). In addition, when an NSL is issued in connection with an investigation of a "United States person," the same officials must certify that the investigation is "not conducted solely on the basis of activities protected by the first amendment." *Id.*

### 2.   Confidentiality of National Security Letters

Counterintelligence and counterterrorism investigations ordinarily must be carried out in secrecy if they are to succeed. Because these investigations are directed at groups taking efforts to keep their own activities secret, it is essential that targets not learn that they are the subject of an investigation. If targets learn that their activities are being investigated, they can be expected to take action to avoid detection or disrupt the government's intelligence gathering efforts. Likewise, knowledge about the scope or progress of a particular investigation allows targets to determine the FBI's degree of penetration of their activities and to alter their timing or methods. (Perdue Decl. ¶¶ 55-56).

The same concern applies to knowledge about the sources and methods the FBI is using to acquire information, knowledge which can be used both by the immediate targets of an investigation and by other terrorist and foreign intelligence organizations. And even after a

particular investigation has been completed, information about the FBI's use of NSLs can educate different terrorist and foreign intelligence organization about how to circumvent and disrupt such intelligence gathering in the future. For that reason, disclosures can compromise national security investigations and endanger the national security even when they concern closed investigations. (Perdue Decl. ¶¶ 55-71).

The secrecy needed for successful counterintelligence and counterterrorism investigations can be compromised if a telephone company or Internet service provider discloses that it has received or provided information pursuant to an NSL. (Perdue Decl. ¶¶ 55-56). To avoid that result, Congress has placed restrictions on disclosures by NSL recipients. 18 U.S.C. § 2709(c).

As revised in 2006, the nondisclosure requirement no longer applies automatically in all cases, but instead requires a senior FBI official to certify, case by case, that "otherwise there may result a danger to the national security of the United States, interference with a criminal, counterterrorism, or counterintelligence investigation, interference with diplomatic relations, or danger to the life or physical safety of any person." *Id.* § 2709(c)(1). If such a certification is made, the NSL itself notifies the recipient of the nondisclosure obligation. *Id.* § 2709(c)(2). The recipient may then petition a district court, at any time, "for an order modifying or setting aside" the nondisclosure requirement. *Id.* § 3511(b)(1). If the petition is filed more than a year after the NSL was issued, the FBI or DOJ must either re-certify the need for nondisclosure or terminate the nondisclosure requirement within ninety days after the petition is filed. *Id.* § 3511(b)(3). A district court "may modify or set aside" the nondisclosure requirement if the court finds "no reason to believe" that disclosure "may endanger the national security of the United States, interfere with a criminal, counterterrorism, or counterintelligence investigation, interfere with diplomatic relations, or endanger the life or physical safety of any person." *Id.* § 3511(b)(2),

4

(b)(3). If a petition is filed a year or more after the issuance of the NSL, the recipient may file a successive petition after one year. *Id.* § 3511(b)(3).

In *John Doe, Inc. v. Mukasey*—a case brought by the present plaintiff—the Second Circuit interpreted the nondisclosure provisions to protect the First Amendment interests of NSL recipients. To avoid constitutional concerns, the circuit interpreted §§ 2709 and 3511 to "place on the Government the burden to show that a good reason exists to expect that disclosure of receipt of an NSL will risk an enumerated harm." 549 F.3d 861, 883 (2d Cir. 2009). To meet its burden, the government "must at least indicate the nature of the apprehended harm and provide a court with some basis to assure itself (based on *in camera* presentations where appropriate) that the link between disclosure and risk of harm is substantial." *Id.* at 881. The court held that the First Amendment obligates the government to initiate judicial review of the nondisclosure requirement if the recipient promptly notifies the government that it intends to challenge that requirement.[2] 549 F.3d at 879, 883-84.

### 3.   Confidentiality of the Attachment

The NSL issued in this case sought "electronic communication transactional records, to include existing transaction/activity logs and all e-mail header information (not to include message content and/or subject fields)." (Merrill Decl. Ex. A; Perdue Decl. ¶ 30). The NSL contained an "Attachment," which specified the types of information that may be considered to be electronic communication transactional records: "In preparing your response to this request, you should determine whether your company maintains the following types of information which may be considered by you to be an electronic communication transactional record in accordance

---

[2]     In the case before it, however, the court of appeals held that requiring the government to reinitiate judicial review when Merrill's case was already proceeding would be "pointless," and accordingly remanded to this Court. 549 F.3d at 885.

with Title 18, United States Code, Section 2709," followed by a list of types of information. (Perdue Decl. ¶¶ 55-57). The Attachment was standard at the time the 2004 NSL was issued. (Perdue Decl. ¶ 72). Although the language and form have changed in certain respects over the years, NSLs issued under § 2709 frequently seek the same information. (Perdue Decl. ¶ 72).

Electronic communication transactional records of the types specified in the Attachment are used by the FBI to help develop investigative leads, determine the contacts of the subject of an investigation, and assess whether other investigative steps would be appropriate. (Perdue Decl. ¶¶ 9-13, 55-56). As the FBI has stated, disclosure of the still-undisclosed parts of the Attachment would provide the subjects of national security investigations, as well as other adversaries including foreign intelligence services, with an indication of the types of information the FBI uses to conduct those investigations and the types of information the FBI deems important for investigative purposes. (Perdue Decl. ¶¶ 55-71). That disclosure could possibly cause subjects and adversaries to change their behavior or disguise their identities or activities to evade detection and enforcement of the law. (Perdue Decl. ¶¶ 55-71). In short, disclosure of the FBI's investigative methods and techniques by revelation of the Attachment would facilitate the circumvention of lawful FBI investigations. (Perdue Decl. ¶ 71). For that reason, the effects of disclosure of the Attachment would extend beyond any specific investigation and compromise other present and future investigations, severely harming the FBI's abilities, among other things, to thwart future terrorist activities. (Perdue Decl. ¶¶ 55-71).

**B.   Merrill's Challenges to NSLs' Nondisclosure Requirements**

  **1.   The *John Doe, Inc.* Litigation**

The FBI delivered an NSL to Nicholas Merrill in February 2004, in his capacity as president of Calyx Internet Access, an Internet service provider. 549 F.3d at 865; (Perdue Decl.

¶¶ 25-32). Merrill and Calyx sued, challenging both the requirement to produce information and the NSL's nondisclosure requirement. 549 F.3d at 866. After a series of rulings by this Court and the district court in Connecticut, an amendment to the relevant statutes, and the FBI's withdrawal of the NSL's request for information, the Second Circuit issued *John Doe, Inc.*, described above.

On remand to this Court, the government filed a certification by the deputy assistant director of the FBI that disclosure of the NSL at issue may result in harms enumerated in 18 U.S.C. § 2709(c), accompanied by a classified ex parte declaration by an FBI supervisory special agent explaining why disclosure of the NSL may result in those harms. 665 F. Supp. 2d 426, 428-29 (S.D.N.Y. 2009). Nevertheless, Merrill moved to be allowed to disclose the NSL. *Id.* This Court denied that motion, holding that "the Government has carried its burden and that continuation of the nondisclosure requirement imposed on [Merrill] is justified." *Id.* at 429. The Court was "persuaded that the Government has demonstrated that a good reason exists to believe that disclosure may result in a harm related to an authorized ongoing investigation to protect against international terrorism or clandestine intelligence activities," and that "the link between disclosure and the risk of harm is substantial." *Id.* at 432. The Court declined to consider the Attachment to the NSL "separately," as it was "part of the NSL issued to [Calyx]" and there was no reason to "disaggregate the NSL into component parts." *Id.* at 432-33.

Finally, the Court noted "that this ruling does not constitute a permanent bar on the NSL's disclosure." *Id.* at 433. Although "[t]he First Amendment requires that a nondisclosure order be maintained only as long as it is 'narrowly tailored to promote a compelling Government interest,' and that there are no 'less restrictive alternatives [that] would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve,' " the statute's existing mechanisms were sufficient to satisfy these constitutional concerns: "Subsection 3511(b) provides that NSL

7

recipients can challenge the nondisclosure requirement annually. Plaintiffs therefore possess the right to challenge the nondisclosure order again in the future if it remains necessary to do so." *Id.* (quoting *John Doe, Inc.*, 549 F.3d at 878; citations omitted).

Merrill then moved for reconsideration "insofar as [the October 2009 order] pertained to the Attachment." 703 F. Supp. 2d 313, 315 (S.D.N.Y. 2010). Merrill advanced the same arguments then as he does now: "that the Government has not provided adequate explanation to justify suppressing the Attachment as necessary to national security interests or to protect an ongoing investigation of terrorist activity," and "that disclosure of the Attachment would serve the public interest in understanding the type of personal records the FBI has sought to obtain through NSLs, and thus to inform congressional and public debate on the subject." *Id.* The government responded with evidence that disclosure of the NSL's Attachment "would compromise not only the current FBI investigation involving the NSL and target in this case but future probes as well, thus potentially hampering Government efforts to address national security threats." *Id.* at 316. After holding that certain limited information must be disclosed from the Attachment because it was referred to in the statute itself or had previously been disclosed, the Court ruled for the government as to the bulk of the Attachment: "the Government has demonstrated that good reason exists to believe that disclosure of the information withheld plausibly could harm an authorized ongoing investigation to protect against international terrorism or clandestine intelligence activities" and "the link between disclosure and the risk of harm is substantial." *Id.*

The Court specifically relied on the harm to investigations other than the one for which the NSL had been issued: "the Government has demonstrated a reasonable likelihood that disclosure of the Attachment in its entirety could inform current targets of law enforcement investigations,

8

including the particular target of the Government's ongoing inquiry in this action, as well as, potentially, future targets, as to certain types of records and other materials the Government seeks through national security investigations employing NSLs." *Id.* at 317. In particular, the Court found that disclosure of the Attachment could provide "valuable insights into the agency's investigative methods that could produce the harms the NSL statute sought to safeguard against," and "prompt changes" in the behavior of unspecified "targets" "to prevent detection." *Id.* "Thus, the Court is satisfied that the information sought by the Attachment does not entail undue impairment of First Amendment rights or other unwarranted abusive practice on the part of the FBI." *Id.* That conclusion, the Court held, obtained due to the "deference" due the government's views in matters of national security and terrorism, fortified by the common-sense observation that "[i]ndividuals intent on carrying out illegal activities often manage to remain outside the reach of the law, one step ahead of the police and forearmed by resourceful monitoring of the information the government gathers through law enforcement methods and technologies." *Id.* (citing *CIA v. Sims*, 471 U.S. 159, 178 (1985)).

Merrill filed a notice of appeal, but the parties then entered into a stipulation by which the appeal was withdrawn and the action dismissed. Specifically, the FBI agreed that, due to changed circumstances, Merrill and Calyx could disclose that they were the recipients of the NSL and the plaintiffs in the lawsuit. (Manes Decl. Ex. C). Merrill agreed that the NSL would otherwise remain subject to the nondisclosure requirement, but he would retain his right under § 3511 to seek an order in the future modifying or setting aside that requirement.

### 2. Merrill's Current Lawsuit

In January 2014, Merrill's counsel e-mailed the government's attorney, stating that Merrill wished to "renew his challenge" to the remaining nondisclosure requirement, but seeking to

9

"discuss the possibility that the government might voluntarily lift all or part of the gag, and thereby avoid the need for further litigation." (Manes Decl. Ex. B). Within a month, the FBI informed Merrill that it would allow disclosure of the NSL in its entirety, with the exception of the parts of the Attachment subject to nondisclosure as upheld by this Court. The parties then entered a stipulation, reciting that the FBI, due to changed circumstances, no longer believed that nondisclosure of the NSL, with the exception of the nonpublic parts of the Attachment, was necessary to prevent the harms set forth in the statute. (Manes Decl. Ex. A). The stipulation thus stated that the nondisclosure requirement would continue to apply to the nonpublic parts of the Attachment, but was "no longer in effect" otherwise. (*Id.* ¶¶ 1-2). The 2014 stipulation also expressly preserved Merrill's and Calyx's ability to petition in the future under § 3511 to modify or lift the remaining nondisclosure directive. (*Id.* ¶ 3).

In December 2014, Merrill filed the current lawsuit. Despite the FBI's agreement to lift nearly all of the nondisclosure requirement pertaining to the NSL in this case, Merrill complains that he remains prohibited from disclosing the contents of much of the Attachment.

**Argument**

This Court correctly rejected Merrill's attempt to disclose the Attachment in 2010, and essentially nothing material has changed in the interim. Although the investigation underlying the NSL issued to Merrill is now closed—and for that reason, the FBI has narrowed the nondisclosure requirement as much as possible and freely permitted Merrill to disclose specific information he knows about that investigation—the status of that investigation was not the sole basis for this Court's prior decision. It relied equally on the harm that would be occasioned on future investigations by disclosure of the FBI's methods, techniques, and procedures. As the FBI has now averred in its declaration, that same harm would be caused by the disclosure Merrill

10

again seeks to make. As it was in 2010, that is a sufficient "good reason" to continue the statutory nondisclosure requirement. The government is therefore entitled to summary judgment.

### A.   A Nondisclosure Requirement Is Justified Under Any Level of Scrutiny

As discussed below, the high, indeed strict, scrutiny applied by *John Doe, Inc.* controls this case. But regardless of the level of scrutiny the Court applies, the government should prevail. Nondisclosure of the nonpublic portions of the Attachment is narrowly tailored to serve a compelling government interest, and therefore passes constitutional muster under any test.

### 1.   The Government Has a Compelling Interest in the Nondisclosure Requirement

Both this Court and the Second Circuit have previously acknowledged that the government has a compelling interest at issue in this case. In general, maintaining the secrecy of information that relates to government counterterrorism and counterintelligence investigations is a compelling government interest. *Department of Navy v. Egan*, 484 U.S. 518, 527 (1988) (government has " 'compelling interest' in withholding national security information from unauthorized persons in the course of executive business"); *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980) ("The Government has a compelling interest in protecting . . . the secrecy of information important to our national security"). Thus, as the Second Circuit held in Merrill's previous case, "since 'it is obvious and unarguable that no governmental interest is more compelling than the security of the Nation,' the principal strict scrutiny issue turns on whether the narrow tailoring requirement is met." *John Doe, Inc.*, 549 F.3d at 878 (quoting *Haig v. Agee*, 453 U.S. 280, 307 (1981)).

Even aside from the interest in national security, the investigation of crime is independently a compelling government interest. *Branzburg v. Hayes*, 408 U.S. 665, 700 (1972) ("the investigation of crime by the grand jury implements a fundamental governmental role of

securing the safety of the person and property of the citizen"); *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 998 (2d Cir. 1997) ("beyond question that the government has a compelling interest in combatting crime, corruption and racketeering" in First Amendment case); *United States v. Scopo*, 861 F.2d 339, 348 (2d Cir. 1988) ("Investigation of suspected criminals is a fundamental and compelling interest."; First Amendment free-exercise case); *In re Grand Jury Proceedings*, 776 F.2d 1099, 1103 (2d Cir. 1985) (citing *Branzburg* to conclude that investigation of crime is compelling interest in First Amendment case).

Merrill attempts to diminish the government's interests by recasting the Attachment as a statement of the government's legal interpretation of the NSL statute. The argument proves too much: any information about what the government does can be described as information about what the government believes it can do, which, under Merrill's theory, must be disclosed. Were that correct, every nondisclosure requirement would fail, contrary to, e.g., *Kamasinski v. Judicial Review Council*, 44 F.3d 106, 111 (2d Cir. 1994); *First Amendment Coalition v. Judicial Inquiry & Review Bd.*, 784 F.2d 467 (3d Cir. 1986) (en banc); and *Hoffman-Pugh v. Keenan*, 338 F.3d 1136 (10th Cir. 2003). While Merrill maintains that "courts have been rightly skeptical" of the government's efforts to keep secret its interpretations of the law, the courts have in fact been quite solicitous of the government's efforts to protect the confidentiality of its law-enforcement and investigatory techniques, even after specific investigations have closed. *See infra* 18-19.

In arguing to the contrary, Merrill relies entirely on the decision of a magistrate judge in Texas. (Mem. of Law in Support of Plaintiff's Mot. for Summ. J. ("Mem.") 17-18). The magistrate judge there considered two statutes, governing orders authorizing surveillance in the form of pen registers and trap-and-trace devices and access to telephone and e-mail subscriber information; the court interpreted their nondisclosure provisions not to allow the court's prior

12

practice of ordering nondisclosure "until further order of the court," orders that were never sought or granted, meaning that the nondisclosure requirement was effectively permanent. *In re Sealing and Non-Disclosure of Pen/Trap/2703(d) Orders*, 562 F. Supp. 2d 876 (S.D. Tex. 2008). But that conclusion does not govern here for several reasons. The Texas magistrate relied in part on the fact that "no published Fifth Circuit decision has extended [the law-enforcement] privilege" beyond an ongoing investigation, *id.* at 885—but the Second Circuit has. *In re City of New York*, 607 F.3d 923, 934 n.11, 951 (2d Cir. 2010) (applying law-enforcement privilege even without showing that documents pertained to ongoing investigations). The Texas court also observed that "the 'exact nature or configuration' of the device" would not be disclosed by its ruling, and that such information was already available publicly. 562 F. Supp. 2d at 885. Here, in contrast, the exact nature of the FBI's investigatory techniques would be revealed, information not now known to the public. (Perdue Decl. ¶¶ 55-70). The magistrate's discussion of "disclosure of this 'sensitive' investigative technique" thus appears to refer not to the details of the pen/trap technique (analogous to what is at issue now), but only to the "frequency" with which the technique is used—making it irrelevant to the present case. Finally, unlike § 3511(b), the statutes before the Texas magistrate judge had no built-in mechanism by which those subject to a nondisclosure requirement could periodically seek judicial review of that requirement—a mechanism both this Court and the Second Circuit relied on in upholding the nondisclosure requirement of NSLs. 549 F.3d at 883-84; 665 F. Supp. 2d at 433.

Merrill further argues that "the government's conduct belies any claim that it has a compelling interest" here, because the government has itself disclosed some information about NSLs. (Mem. 18). With respect to two of those items—"Screen names or other on-line names associated with the account" and "All e-mail addresses associated with the account"—the

13

government now concedes that a nondisclosure requirement is not needed, and (further illustrating its willingness to revisit the nondisclosure requirement) the FBI has also determined that one additional item—"Internet service provider (ISP)"—also does not need continued secrecy. (Perdue Decl. ¶ 57). Accordingly, attached to these papers is a less-redacted version of the Attachment issued to Merrill.

On the other hand, one of the items Merrill cites—a DOJ Inspector General report that refers to "billing records and method of payment" obtainable through NSLs—does not in fact reveal what is in the NSL Attachment (where the word "billing" is already unredacted (Merrill Decl. Ex. C)), and thus does not diminish the FBI's need for nondisclosure. (Perdue Decl. ¶ 66); *see Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009) (agency has not lost ability to keep information secret by official disclosure unless it "(1) is as specific as the information previously released, [and] (2) matches the information previously disclosed" (quotation marks and alterations omitted)). Merrill also cites a letter published in a Senate report, but that information was not disclosed to the public by the FBI, and thus does not forfeit the FBI's ability to continue to protect its confidentiality. *Wilson*, 586 F.3d at 186-87 ("the law will not infer official disclosure of information . . . from . . . release of information by another agency, or even by Congress"); *Earth Pledge Foundation v. CIA*, 128 F.3d 788 (2d Cir. 1997), *aff 'g and adopting the op. in* 988 F. Supp. 623, 627-28 (S.D.N.Y. 1996) ("public disclosure in [congressional documents] of some of the information requested by plaintiffs does not undermine [the agency's] justifications for refusing to confirm or deny the existence of this information"); *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990); *Salisbury v. United States*, 690 F.2d 966, 971 (D.C. Cir. 1982).

In any event, Merrill's effort to argue that because the FBI has disclosed certain items on the Attachment, "the government in truth has no compelling interest in keeping *any* of this kind of information secret" (Mem. 18-19 (emphasis added)) is simply illogical. That the FBI has chosen to maximize public information regarding NSLs by disclosing certain items says nothing about the need for secrecy about other items. *Center for National Security Studies v. DOJ*, 331 F.3d 918, 930–31 (D.C. Cir. 2003) ("The disclosure of a few pieces of information in no way lessens the government's argument that complete disclosure would provide a composite picture of its investigation and have negative effects on the investigation.").

**2.    Nondisclosure of the Attachment Is Narrowly Tailored to Serve the Government's Interest**

To "protect[ ] . . . the secrecy of information important to our national security," *Snepp*, 444 U.S. at 509 n.3, Congress directed that critically sensitive information not be disclosed by NSL recipients when the FBI certifies the need for that secrecy. *John Doe, Inc.* upheld that requirement on its face, and set forth the Second Circuit's test for when that requirement meets constitutional standards in a particular case. The government must demonstrate that there is "a good reason to believe that a[ statutorily] enumerated harm may result" from disclosure of an NSL. 549 F.3d at 881. The enumerated harms are "danger to the national security of the United States, interference with a criminal, counterterrorism, or counterintelligence investigation, interference with diplomatic relations, or danger to the life or physical safety of any person." 18 U.S.C. § 2709(c).

Although the government bears the burden of showing the need for nondisclosure, the district court must "normally defer to the Government's considered assessment of why disclosure in a particular case may result in an enumerated harm related to such grave matters as international terrorism or clandestine intelligence activities." 549 F.3d at 881. This deferential

standard recognizes the executive branch's expertise (and the judicial branch's lack of such expertise) in law enforcement and national security matters. While the Court may not uphold a nondisclosure requirement based solely on a conclusory assurance by the government, it need only "requir[e] *some* elaboration" beyond the mere assertion of necessity. *Id.* (emphasis added). Thus, "[i]n showing why disclosure would risk an enumerated harm, the Government must at least indicate the nature of the apprehended harm and provide a court with some basis to assure itself (based on *in camera* presentations where appropriate) that the link between disclosure and risk of harm is substantial." *Id.*

The government has met that test. As demonstrated in the Perdue Declaration, disclosure of the nonpublic parts of the Attachment could be expected to compromise future investigations by revealing to current and future subjects of investigations, and to foreign intelligence services and other adversaries, the ways in which the FBI uses an NSL and the types of information the FBI can obtain through the NSL mechanism concerning the user of an e-mail account. (Perdue Decl. ¶¶ 55-56). That disclosure would also expose what information the FBI deems important in its national security investigations. (*Id.* ¶ 56). By doing so, the disclosure would permit potential terrorists, criminals, or intelligence adversaries to avoid detection by using other means of communication that would not be available to the FBI through an NSL. (*Id.*). Accordingly, based on specific facts and the FBI's careful review by high-level officials (*id.* ¶¶ 1-8, 71), the government has demonstrated that good reason exists to believe that Merrill's proposed disclosure may result in the harms enumerated in § 2709, and there is a direct and substantial link between the proposed disclosure and those harms. Nor is there any other means of preventing the harms that disclosure would cause. The nondisclosure requirement here is therefore narrowly tailored to meet the government's compelling interests, and comports with the Constitution.

Merrill principally contends (Mem. 21-25) that a nondisclosure requirement cannot be justified once the specific investigation of which the NSL was a part has ended, as is the case here. (Perdue Decl. ¶ 54). But that argument contradicts the statute, precedent, and common sense. As the FBI has explained here, the Attachment reflects FBI law-enforcement techniques and procedures, whose disclosure would compromise their usefulness, allow their evasion by subjects of FBI investigations, and compromise national security and law-enforcement efforts. (Perdue Decl. ¶¶ 55-71).

To begin with, nothing in the statute itself says that the certified harms justifying a nondisclosure requirement must be tied to a specific investigation. Section 2709(c)(1) states that the FBI may require nondisclosure if "otherwise there may result a danger to the national security of the United States, interference with a criminal, counterterrorism, or counterintelligence investigation, interference with diplomatic relations, or danger to the life or physical safety of any person." None of those terms requires that the enumerated harms be connected to the single investigation that gave rise to the NSL. Merrill essentially concedes as much by instead relying on the statutory provision authorizing the FBI to seek records rather than the provision authorizing the FBI to require nondisclosure, noting that the former depends on "relevan[ce] to an authorized investigation." (Mem. 22 (citing § 2709(b)(1)). But it only makes sense that Congress would require that records being sought be "relevant" to an investigation. On the other hand, it makes no sense that Congress would allow a nondisclosure requirement to protect only the one investigation that gave rise to an NSL, and only as long as it is open, even when the FBI can demonstrate that disclosure of the NSL would cause grave harm to national security or other criminal or counterterrorism investigations. For that reason,

17

Congress did not include the same language regarding "relevan[ce]" in § 2709(c), limiting nondisclosure requirements, as it did in § 2709(b).[3]

Indeed, in other contexts, courts and Congress have recognized that disclosure of law-enforcement techniques and procedures can be harmful, even when a specific investigation of which those techniques were a part has ended. Preserving the confidentiality of "the procedures by which the agency conducted its investigation and by which it has obtained information" is "necessary for effective law enforcement." *Frankel v. SEC*, 460 F.2d 813, 817 (2d Cir. 1972). Thus, "[i]f an agency's investigatory files were obtainable without limitation after the investigation was concluded, future law enforcement efforts by the agency could be seriously hindered," due to the revelation of its "investigatory techniques and procedures." *Id.*; *accord Weisberg v. DOJ*, 489 F.2d 1195, 1199 (D.C. Cir. 1973) (en banc). For that reason, courts have repeatedly recognized that law enforcement agencies are entitled to protect the confidentiality of those techniques and procedures even after specific investigations have closed. *City of New York*, 607 F.3d at 934 n.11, 940-41 (noting that goal of "prevent[ing] disclosure of law enforcement techniques and procedures" is of "such importance" that law enforcement privilege has been recognized by courts, Congress, and state legislatures, and that "[i]t is hard to imagine . . . many questions of law that carry greater significance"; applying privilege even without showing that information "pertains to *ongoing* investigations" (quotation marks omitted)); *Nat'l Cong. for Puerto Rican Rights ex rel. Perez v. City of New York*, 194 F.R.D. 88, 95 (S.D.N.Y. 2000) ("An investigation need not be ongoing for the law enforcement privilege to apply as 'the ability of a

---

[3]     Despite Merrill's reading (Mem. 22-23), the reference in § 3511(b)(1) to "a nondisclosure requirement imposed in connection with such a request [for records by various types of NSL]" does not contradict this reading. That language is on its face a catchall intended to incorporate NSLs issued under numerous statutes, beyond § 2709. There is no dispute that a nondisclosure requirement is issued "in connection with" the underlying NSL, but that does not limit the types of harms that justify nondisclosure, harms that are expressly spelled out in the respective statutes.

law enforcement agency to conduct future investigations may be seriously impaired if certain information is revealed.' " (quoting *Morrissey v. City of New York*, 171 F.R.D. 85, 90 (S.D.N.Y. 1997)); *Borchers v. Commercial Union Assur. Co.*, 874 F. Supp. 78, 80 (S.D.N.Y. 1995). Even when there has been a "ten year lapse of time between th[e] litigation and the original investigation," "the public interest in nondisclosure can[not] be disregarded simply because the principal investigation" has ended. *Black v. Sheraton Corp.*, 564 F.2d 531, 546 (D.C. Cir. 1977).

Although those cases arose in different contexts, allowing the government to withhold information as privileged or as exempt from FOIA, their principles—that preservation of the confidentiality of law enforcement techniques, methods, and procedures is critical, regardless of whether a particular investigation is ongoing—still pertain.[4] Merrill essentially advocates a "one and done" view of law enforcement methods, under which the FBI can use a technique only once in an NSL before it loses the protection of § 2709(c). Were that correct, this Court would not have held that disclosure of the Attachment "could inform current targets of law enforcement *investigations*, including the particular target of the Government's ongoing inquiry in this action, as well as, potentially, *future targets*, as to certain types of records and other materials the Government seeks through national security investigations employing NSLs," 703 F. Supp. 2d at 317 (emphasis added), or that disclosure of the Attachment could provide "valuable insights into the agency's investigative methods that could produce the harms the NSL statute sought to safeguard against," and "prompt changes" in the behavior of future "targets" "to prevent detection," *id.* That ruling correctly recognized that Congress's purpose and language in the nondisclosure provision of § 2709(c) goes beyond the confines of a single investigation.

---

[4]     They also contradict Merrill's unexplained contention that harm to national security or other harms enumerated in § 2709(c) must "flow from disclosing the existence of a *particular* investigation." (Mem. 23). If disclosure causes harm to investigations or national security in general—as the cases cited here recognize it can—then § 2709(c)'s requirements are met.

Lastly, Merrill maintains that the nondisclosure requirement is overly broad in scope, because the information sought by the Attachment could also be obtained by other means. (Mem. 19-20). Again, that argument proves too much: through, for example, a warrant or a grand-jury subpoena, the government can obtain nearly any record about nearly anything once it has satisfied the prerequisites for utilizing those means of investigation. The point here, however, is that harm would result from disclosing to subjects of investigations or other adversaries that the FBI can obtain this information by using an NSL, effectively an administrative subpoena, in the course of its own counterterrorism or national-security investigations. (Perdue Decl. ¶¶ 55-56).

**B.    *John Doe, Inc.*'s Analysis Governs Here**

Merrill attempts to heighten the government's bar, advancing arguments rejected in *John Doe, Inc.* in favor of a stricter level of scrutiny. (Mem. 11-20). But the only difference between the restrictions at issue now and those at issue in the Second Circuit's decision and this Court's rejection of Merrill's position in 2010 is that the FBI, in light of the passage of time, has relaxed the nondisclosure requirement to the barest minimum needed to continue to protect against harm to the national security and its investigations. Merrill's attack on the narrower nondisclosure requirement should fare no better than his losing arguments against the broader one.

The Second Circuit set out the pertinent test: the government bears the "burden to show that a good reason exists to expect that disclosure of receipt of an NSL will risk an enumerated harm," *John Doe, Inc.*, 549 F.3d at 883; to do so it must "at least indicate the nature of the apprehended harm and provide a court with some basis to assure itself (based on *in camera* presentations where appropriate) that the link between disclosure and risk of harm is substantial," *id.* at 881. In reaching that conclusion, the court of appeals considered all of the points Merrill now raises: that § 2709(c) violates the First Amendment by allegedly "permanently barring NSL

20

recipients from disclosing that the FBI had sought or obtained information from them," 549 F.3d at 866, 884 n.16; (Mem. 13-14); that the nondisclosure requirement is content-based or a prior restraint, 549 F.3d at 873; (Mem. 15); and that the requirement restrains speech "relevant to intended criticism of a governmental activity," 549 F.3d at 878; (Mem. 15-17). It was because it balanced all of these doctrines and considerations—not, as Merrill would now have it, in spite of them—that the court of appeals reached the test it announced, a test that applies here.

Merrill suggests that this Court should deviate from the Second Circuit's precedent because the *John Doe, Inc.* court "was considering a facial challenge to the statute," in contrast to Merrill's current as-applied challenge. (Mem. 11-12). But that argument misunderstands the nature of constitutional challenges. "Facial and as-applied challenges differ in *the extent to which* the invalidity of a statute need be demonstrated (facial, in all applications; as-applied, in a personal application). Invariant, however, is the *substantive rule of law* to be used." *Brooklyn Legal Services v. Legal Services Corp.*, 462 F.3d 219, 228 (2d Cir. 2006), *overruled on other grounds*, *Bond v. United States*, 131 S. Ct. 2355, 2361 (2011). Accordingly, Merrill cannot argue that by bringing an as-applied challenge in 2014, he can subject the statute to a different test than when he brought a facial challenge in 2004: "*how* one must demonstrate the statute's invalidity remains the same for both types of challenges, namely, by showing that a specific rule of law, usually a constitutional rule of law, invalidates the statute, whether in a personal application or to all." *Id.*

Merrill's other arguments for changing the Second Circuit's result are equally meritless. He repeatedly refers to the nondisclosure requirement as a "prior restraint" and invokes the "heavy presumption against [the] constitutional validity" of such restrictions. (*E.g.*, Mem. 11-12). But *John Doe, Inc.* considered this point—"Although the nondisclosure requirement is in some sense

a prior restraint . . . it is not a typical example of such a restriction for it is not a restraint imposed

on those who customarily wish to exercise rights of free expression, such as speakers in public

fora, distributors of literature, or exhibitors of movies." 549 F.3d at 876. Similarly, Merrill

describes the nondisclosure requirement as a "classic content-based restriction on speech."

(Mem. 15). Similarly, the court of appeals disagreed: "although the nondisclosure requirement is

triggered by the content of a category of information, that category, consisting of the fact of

receipt of an NSL and some related details, is far more limited than the broad categories of

information that have been at issue with respect to typical content-based restrictions." *Id.* That

characterization belies Merrill's exaggerated contention that the nondisclosure requirement is a

"prohibition on discussing an entire area of public policy" (Mem. 15)—Merrill (and everyone

else) is free to offer views on public policy; he just may not, having learned of law-enforcement

techniques through his position as an electronic communication service provider, disclose those

confidential and sensitive techniques in light of the FBI's certification that such disclosure would

cause a statutorily enumerated harm.

   Merrill places great weight on characterizing the nondisclosure requirement as

"permanent." (Mem. 13-14, 19). As a factual matter, that ignores the FBI's repeated willingness

to reassess and reduce the scope of the nondisclosure requirement in light of changing needs and

circumstances. (Manes Decl. Exs. A, C; *supra* at 13). At present, Merrill can disclose the entirety

of the NSL proper—including the date, his identity as the recipient, and the e-mail address

identifying the subject of the investigation. (Manes Decl. Ex. A). The FBI has permitted this to

accommodate Merrill's rights to speak, despite the nature of the underlying investigation, which

involved sensitive and important matters of national security. (Perdue Decl. ¶¶ 14-54).

Moreover, Merrill can disclose large portions of the Attachment. (Merrill Decl. Ex. C;

Attachment appended to this memorandum). The only information still subject to a nondisclosure requirement consists of portions of the Attachment that are still generally unknown and whose disclosure would—by revealing and thus enabling evasion of law-enforcement techniques—cause harm to national security and FBI investigations, as provided in § 2709(c). (Perdue Decl. ¶¶ 55-71).

As a matter of law, Merrill's permanency argument disregards the express statutory provision permitting him (or any NSL recipient) to not only challenge the nondisclosure requirement, but to do so repeatedly at short intervals. As provided in § 3511(b), the preclusive effect of a court's denial of a petition to modify or lift a nondisclosure requirement lasts for only one year. 18 U.S.C. § 3511(b)(3); *John Doe, Inc.*, 549 F.3d at 883-84 (recognizing "existing opportunities for annual challenges to the nondisclosure requirement," in which "the standards and burden of proof that we have specified for an initial challenge would apply, although the Government would not be obliged to initiate judicial review"). The Second Circuit expressly rejected the argument that the annual review provision "unduly prolonged the duration of the nondisclosure requirement," holding that "limiting an NSL recipient to annual opportunities . . . to terminate the nondisclosure requirement does not violate First Amendment procedural requirements." 549 F.3d at 884 n.16. That is true, the court of appeals held, because "[t]he information subject to nondisclosure is extremely limited." *Id.*

Moreover, and directly contrary to Merrill's argument that any "open-ended" nondisclosure requirement is permanent and therefore constitutionally impermissible, the court of appeals recognized that "once the need for secrecy—avoiding risk of harm related to international terrorism—has been shown, that need is not likely to dissipate soon." 549 F.3d at 884 n.16. This Court, on remand, also observed that upholding an NSL's nondisclosure requirement "does not

23

constitute a permanent bar on the NSL's disclosure." 665 F. Supp. 2d at 433. Under the First Amendment, "a nondisclosure order [may] be maintained only as long as it is 'narrowly tailored to promote a compelling Government interest,' and . . . there are no 'less restrictive alternatives that would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve.' " *Id.* But the annual review provision of § 3511(b) gives NSL recipients "the right to challenge the nondisclosure order"—and put the government to its burden of proof—"again in the future if it remains necessary to do so." *Id.* That procedural protection suffices to insulate the nondisclosure requirement from becoming a permanent and unconstitutional restriction.[5]

Merrill contends that because the investigation underlying the NSL's request for information has ended, the nondisclosure requirement has become "untethered" from an ongoing investigation, making it a permanent ban. (Mem. 13). But as described above, nothing in the statute or the Constitution requires that a specific investigation be at issue—what matters, as the Second Circuit has held, is that the government can still meet its burden of showing one of the harms set out in the statute will occur. In this case, because the investigation is over, the FBI has permitted Merrill to disclose all information provided to him in the NSL that was specific to that investigation. But because the FBI has certified and shown that statutory harms will result from disclosure of the FBI's techniques and procedures, § 2709 continues to require nondisclosure of the information whose disclosure would cause that harm.[6]

---

[5]    Because the FBI's application of the provision here is constitutional, Merrill's constitutional avoidance argument is meritless. (Mem. 25). In any event, the statute is not ambiguous, as it plainly authorizes a nondisclosure requirement as long as the FBI certifies and supports that an enumerated harm would result from disclosure. 18 U.S.C. § 2709; *John Doe, Inc.*, 549 F.3d at 883-84 & n.16.

[6]    The fact that the government has the burden of justifying a nondisclosure requirement, as often as annually, shows that Merrill's contention that the FBI "claims unilateral power to enjoin the speech of private citizens for as long as it sees fit" (Mem. 14) is mistaken. The FBI's nondisclosure requirement must be—and has been—justified before the Court.

Finally, Merrill maintains that a higher level of scrutiny than prescribed by the court of appeals should obtain because he proposes to speak about "government activity," and that places his disclosures "at the core of First Amendment protection." (Mem. 15-16). But Merrill argued the same point before the Second Circuit, which already factored that aspect into its formulation. 549 F.3d at 877-78 (noting, in declining to impose a standard of review "significantly diminished" from strict scrutiny, that "[Calyx] has been restrained from publicly expressing a category of information, albeit a narrow one, and that information is relevant to intended criticism of a governmental activity").

## Conclusion

Because the FBI has shown a good reason to believe that disclosure of the Attachment will cause a harm enumerated in § 2709, the continuation of the nondisclosure requirement comports with the First Amendment and *John Doe, Inc.* The government is therefore entitled to judgment.

Dated:    New York, New York                     Respectfully submitted,
          April 24, 2015

                                                 PREET BHARARA
                                                 United States Attorney for the
                                                 Southern District of New York
                                                 Attorney for Defendants

                                          By:    /s/ Benjamin H. Torrance
                                                 BENJAMIN H. TORRANCE
                                                 Assistant United States Attorney
                                                 86 Chambers Street
                                                 New York, New York 10007
                                                 Telephone: 212.637.2703
                                                 Fax: 212.637.2702
                                                 E-mail: benjamin.torrance@usdoj.gov