UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X
                        :

NICHOLAS MERRILL,           :

          Plaintiff,    :     14-CV-9763 (VM)

     - against -       :     **DECISION AND ORDER**

LORETTA E. LYNCH, in her official  :
Capacity as Attorney General of   :
The United States, and         :
JAMES B. COMEY, in his official   :
Capacity as Director of the     :
Federal Bureau of Investigation,  :
                        :
          Defendants.   :
                        :
------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/28/15

**VICTOR MARRERO, United States District Judge.**

    Plaintiff Nicholas Merrill ("Merrill") brought suit seeking injunctive relief against defendants Loretta E. Lynch, in her official capacity as Attorney General of the United States, and James B. Comey, in his official capacity as Director of the Federal Bureau of Investigation (collectively, "Defendants" or "the Government").[1] (Dkt. No. 1 ("Complaint" or "Compl.").) Now before the Court is Merrill's motion for summary judgment, made pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule

---

[1] The Court notes that, at the time Merrill initiated this litigation, Eric Holder, Jr. served as the Attorney General of the United States, and in that official capacity, was a named defendant. Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Loretta E. Lynch for Eric Holder, Jr.

56"), seeking that an order to lift a non-disclosure requirement imposed by a National Security Letter ("NSL") from the Federal Bureau of Investigation (the "FBI"). (Dkt. Nos. 16, 17.) The Government opposes Merrill's summary judgment motion, and also moves to dismiss the Complaint or for summary judgment. (Dkt. Nos. 24, 25.)

## I.   BACKGROUND[2]

In 2004, Nicholas Merrill was the owner and operator of Calyx Internet Access ("Calyx"), a now-defunct company that provided a number of internet services to its clients, including an interface for maintaining their own websites,

---

[2] The factual summary presented herein derives from the following documents: Complaint, filed Dec. 11, 2014, Dkt. No. 1; Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment, dated Mar. 10, 2015, Dkt. No. 16 ("Pl. Mem."); Plaintiff's Rule 56.1 Statement, dated Mar. 10, 2015, Dkt. No. 18; the Declaration of Nicholas Merrill in Support of Plaintiff's Motion for Summary Judgment, dated Mar. 10, 2015, Dkt. No. 19 ("Merrill Decl."); the Declaration of Jonathan Manes in Support of Plaintiff's Motion for Summary Judgment, dated Mar. 10, 2015, Dkt. No. 20 ("Manes Decl."); Government's Memorandum of Law in Support of the Government's Motion to Dismiss or for Summary Judgment, and in Opposition to Plaintiff's Motion for Summary Judgment, dated Apr. 24, 2015, Dkt. No. 25 ("Gov't Mem."); the Declaration of Gary Perdue in Support of the Government Motion, dated Apr. 23, 2015, Dkt. No. 30 ("Perdue Decl."); the Government's Rule 56.1 Counter-Statement, dated Apr. 24, 2015, Dkt. No. 26; Reply Memorandum of Law in Further Support of Plaintiff's Motion for Summary Judgment and in Opposition to Government Motion to Dismiss or for Summary Judgment, dated June 11, 2015, Dkt. No. 36 ("Pl. Reply Mem."); Plaintiff's Rule 56.1 Counter-Statement, dated June 11, 2015, Dkt. No. 37; the Second Declaration of Jonathan Manes in Support of Plaintiff's Motion for Summary Judgment and in Opposition to Government Motion to Dismiss or for Summary Judgment, dated June 11, 2015, Dkt. No. 38 ("Second Manes Decl."); Reply Memorandum of Law in Further Support of the Government's Motion to Dismiss or for Summary Judgment, and in Opposition to Plaintiff's Motion for Summary Judgment, dated July 31, 2015, Dkt. No. 42 ("Gov't Reply Mem."). Except where specifically referenced, no further citation to these sources will be made.

electronic file storage, and email accounts. In February 2004, an FBI agent served Merrill with an NSL (the "2004 NSL"), which was accompanied by an attachment (the "Attachment") listing the types of records the FBI sought from Calyx. Under the USA PATRIOT Act, Pub. L. No. 107-56 §505(a), 115 Stat. 272, 365 (2001),[3] in effect then (and now under the USA FREEDOM Act of 2015, Pub. L. No. 114-23, 129 Stat. 268), the FBI can issue NSLs, a type of administrative subpoena requesting "subscriber information and toll billing records information, or electronic communication transactional records" from a wire or electronic service provider. 18 U.S.C. § 2709(a). Initially, the 2004 NSL prohibited Merrill from disclosing: (1) that he was the recipient of an NSL, (2) the identity of the target of the underlying investigation, and (3) the contents of both the 2004 NSL and the Attachment.

The Court first examined the 2004 NSL in Doe v. Ashcroft, 334 F. Supp. 2d 471 (S.D.N.Y. 2004) ("Doe I"). In Doe I, the Court found an earlier version of 18 U.S.C. Section 2709 ("Section 2709"), which provides the statutory

---

[3] The relevant statutory provisions regarding NSLs were amended by The USA Patriot Improvement and Reauthorization Act of 2005, §§ 115, 116(a), Pub. L. No. 109-177, 120 Stat. 192, 211-14 (Mar. 9, 2006) ("the Reauthorization Act"), and the USA Patriot Act Additional Reauthorizing Amendments Act of 2006, § 4(b), Pub. L. No. 109-178, 120 Stat. 278, 280 (Mar. 9, 2006) ("Additional Reauthorization Act").

authorization for the FBI to issue NSLs, to be unconstitutional on its face. Further, the Court found the Section 2709 nondisclosure requirement unconstitutional under the First Amendment as an unjustified prior restraint and content-based restriction on speech. The Government appealed to the United States Court of Appeals for the Second Circuit, and while the appeal was pending, Congress amended Section 2709 to include a requirement that, to prohibit disclosure of an NSL, the FBI must certify that disclosure may result in an enumerated harm -- i.e., "a danger to the national security of the United States, interference with a criminal, counterterrorism, or counterintelligence investigation, interference with diplomatic relations, or danger to the life or physical safety of any person." 18 U.S.C. § 2709(c)(1). Congress also enacted a section providing for judicial review of an NSL request or related non-disclosure requirement. See 18 U.S.C. § 3511 ("Section 3511"). The Second Circuit remanded to this Court for further consideration in light of these amendments. See Doe v. Gonzales, 449 F.3d 415 (2d Cir. 2006).

On remand, in Doe v. Gonzales, 500 F. Supp. 2d 379 (S.D.N.Y. 2007) ("Doe II"), the Court again found Sections

- 4 -

2709(c) and 3511(b) unconstitutional on their face. The Court ruled that the nondisclosure requirement violated the First Amendment because it was not narrowly tailored in scope or duration. Further, the Court found the judicial review provision violated the constitutional principles of checks and balances, as well as separation of powers.

The Government appealed Doe II, and the Second Circuit affirmed in part and reversed in part. See John Doe v. Mukasey, 549 F.3d 861 (2d Cir. 2008). The Second Circuit invalidated two primary aspects of Sections 2709 and 3511: (1) that FBI certification of certain risks is entitled to a conclusive presumption (absent bad faith) by the courts; and (2) the failure to provide for Government-initiated judicial review. See id. at 884. The Circuit Court construed the remaining parts of Sections 2709 and 3511 to provide certain procedural safeguards (as discussed infra), and held that, with those safeguards, those statutory sections were constitutional. See id. at 883-85.

The Second Circuit then remanded to this Court to determine whether, in the light of the Circuit Court's reading of the statute and the procedural guidance it provided, the non-disclosure requirement was constitutional as-applied to the NSL issued to Merrill. On remand, in Doe

- 5 -

v. Holder, 665 F. Supp. 2d 426 (S.D.N.Y. 2009) ("Doe III"),
the Court found the Mukasey standard satisfied. The Court
held that a "good reason" existed to believe that
"disclosure may result in a harm related to an authorized
ongoing investigation to protect against international
terrorism or clandestine intelligence activities," and that
the "link between disclosure and the risk of harm [was]
substantial." Id. at 432.

Following Doe III, Merrill moved for partial
reconsideration of Doe III as it applied to the Attachment.
See Doe v. Holder, 703 F. Supp. 2d 313 (S.D.N.Y. 2010)
("Doe IV"). The Court granted the motion in part and denied
it in part, ordering certain information disclosed. The
Court found that two categories of material contained in
the Attachment should be disclosed: (1) material within the
scope of what the NSL statute identifies as permissible for
the FBI to obtain through the use of NSLs, and (2) material
that the FBI has publicly acknowledged it has previously
requested by means of NSLs. See id. at 316. The Court was
"not persuaded that disclosure of these two categories of
information would raise a substantial risk that any of the
statutorily enumerated harms would occur." Id. As to the
rest of the Attachment, the Court found that the Government

had demonstrated a "reasonable likelihood that disclosure of the Attachment in its entirety could inform current targets of law enforcement investigations, including the particular target of the Government's ongoing inquiry in this action, as well as, potentially future targets, as to certain types of records and other materials the Government seeks through national security investigations employing NSLs." Id. at 317. In so finding, the Court noted that otherwise innocuous bits and pieces of data, when pieced together, could inform current and potentially future targets of the investigation as to the types of records and other materials sought by the government.

After the Court decided Doe IV, Merrill and the Government reached an agreement under which Merrill could identify himself as the recipient of the NSL. (Doe v. Ashcroft, No. 04-cv-2614 (S.D.N.Y.), Dkt. No. 204 ("July 30, 2010 Stip. and Order of Dismissal").) And in 2014, the parties reached an agreement that Merrill could freely discuss most aspects of the NSL, including the identity of its target, but he could not discuss the Attachment identifying certain types of records the FBI sought, except for those portions of the Attachment identified for disclosure in Doe IV. (Doe v. Ashcroft, No. 04-cv-2614

(S.D.N.Y.), Dkt. No. 227 ("April 15, 2014 Stip. and Order Mod. J.").)

Shortly thereafter, on December 11, 2014, Merrill filed the Complaint against the Government. At the time Merrill filed his instant action, Section 3511(b)(3) allowed NSL recipients to challenge non-disclosure requirements annually.[4] 18 U.S.C. § 3511(b)(3) (in effect Mar. 9, 2006 – June 1, 2015). As such, Merrill's Complaint proceeds as a separate action from Doe I and its progeny.

At issue in this litigation is whether the Government can continue to prohibit disclosure of the redacted Attachment under Sections 2907 and 3511 (as amended on June 2, 2015). Merrill asserts three causes of action: (1) that the non-disclosure order prohibiting discussion of the Attachment is a "permanent or effectively permanent ban on speech" prohibited by the First Amendment; (2) that the nondisclosure order is not justified under Section 3511 because the Government cannot establish a "good reason" to believe that disclosure may result in an enumerated harm related to an authorized investigation to protect against international terrorism or clandestine intelligence

---

[4] As amended, Section 3511 no longer requires an NSL recipient who unsuccessfully challenged a nondisclosure requirement to wait a year or more before again seeking judicial relief. (See Gov't Reply Mem. 3.)

activities; and (3) that, under Sections 2709 and 3511, once an NSL recipient has been permitted to identify himself, to identify the target of the NSL, and to disclose the outcome of the NSL, then the FBI cannot continue a non-disclosure order as regards other aspects of the NSL. Merrill argues that he seeks disclosure in order to contribute to public discussion as to the types of "electronic communications transaction records" that the FBI has sought and continues to seek through NSLs.

For the reasons discussed below, the Court finds that the Government has not satisfied its burden of demonstrating a "good reason" to expect that disclosure of the NSL Attachment in its entirety will risk an enumerated harm, pursuant to Sections 2709 and 3511. Therefore, Merrill's motion for summary judgment is **GRANTED**, and the Government's cross-motion to dismiss the complaint or, in the alternative, for summary judgment is **DENIED**.

## II.   DISCUSSION

### A. STANDARD OF REVIEW

Merrill has moved for summary judgment, pursuant to Rule 56, and the Government has cross-moved to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), or in the alternative for summary judgment,

pursuant to Rule 56. In considering a motion to dismiss, the Court may rely on the factual allegations set forth in the complaint itself and not on additional matters asserted in affidavits, exhibits or other papers submitted in conjunction with the motion. See <u>Friedl v. City of New York</u>, 210 F.3d 79, 83-84 (2d Cir. 2000). Because both sides have submitted substantive declarations or other materials not included in the Complaint, the Court considers the Government's motion as one for summary judgment.

The Court may grant summary judgment only if it finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." <u>Knight v. United States Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir. 1986). The moving party bears the burden of proving that no genuine issue of material fact exists or that by reason of the paucity of evidence presented by the non-movant, no rational factfinder could find in favor of the non-moving

party.   See <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d
1219, 1223 (2d Cir. 1994).

## B. NON-DISCLOSURE ORDERS UNDER SECTIONS 2709 AND 3511

On June 2, 2015, Congress enacted the USA FREEDOM Act,
which, among other statutory changes, revises Sections 2709
and 3511. The Government has indicated its belief that
these changes to Sections 2709 and 3511 "ratify and codify
the Second Circuit's decision in [Mukasey]." (Gov't Reply
Mem. at 2.) The Government notes that the House Committee
Report explicitly indicated that the revisions to Section
3511 "correct[ ] the constitutional defects in the issuance
of NSL nondisclosure orders found [in <u>Mukasey</u>] and adopts
the concepts suggested by that court for a constitutionally
sound process." (Gov't Reply Mem. at 2 n.2 (quoting H. Rep.
No. 114-109, at 24 (2015)).)

In <u>Mukasey</u>, because of disagreement on the panel, the
Second Circuit left open the question whether NSL non-
disclosure orders were subject to strict scrutiny or a
less-exacting scrutiny.[5]   See 549 F.3d at 877-78. Under
either level of scrutiny, however, the Second Circuit

---

[5] The Second Circuit did note that, for purposes of the specific
litigation before it in <u>Mukasey</u>, the Government "conceded that strict
scrutiny is the applicable standard." 549 F.3d at 878. Here, too, the
Government has conceded that the "high, indeed strict, scrutiny applied
by [Mukasey] controls this case." (Gov't Mem. at 11.)

identified two limitations required by the First Amendment:
(1) the Government must initiate judicial review of non-
disclosure requirements if an individual subject to the
non-disclosure requirement so requests, and (2) that
judicial review must be meaningful. <u>See</u> <u>id.</u> at 878-83. As
to this second limitation, the Second Circuit indicated
that, to satisfy First Amendment procedural requirements,
(1) the Government has the burden to (2) show that a good
reason exists to expect that (3) disclosure of receipt of
an NSL will risk an enumerated harm.[6] <u>Id.</u> at 881.

First, by placing the burden on the government to show
a good reason, a district court does not have to "find a
negative, i.e., that no good reason exists to believe that
disclosure may risk one of the enumerated harms." <u>Id.</u> at
876. Second, as to the "good reason" requirement:

> [A] reason will not qualify as 'good' if it surmounts
> only a standard of frivolousness. We understand the
> statutory requirement of a finding that an enumerated
> harm 'may result' to mean more than a conceivable

---

[6] When <u>Mukasey</u> was decided, Section 3511 provided that a court could
modify or set aside a nondisclosure requirement if it found "<u>no reason</u>
to believe that disclosure may endanger the national security of the
United States, interfere with a criminal, counterterrorism, or
counterintelligence investigation, interfere with diplomatic relations,
or endanger the life or physical safety of any person." 18 U.S.C. §
3511(b)(2)-(3) (in effect Mar. 9, 2006 – June 1, 2015) (emphasis
added). At that time, under Section 3511, a court was also to treat an
official certification of that danger as "conclusive" absent a finding
of bad faith. This version of the statute remained in effect -- except
in the Second Circuit as modified by <u>Mukasey</u> -- until June 2, 2015,
when the USA FREEDOM Act took effect.

possibility. The upholding of nondisclosure does not
require the certainty, or even the imminence of, an
enumerated harm, but some reasonable likelihood must
be shown. The Government acknowledges that while the
"reason to believe" standard in subsection 3511(b)
unquestionably contemplates a deferential standard of
review, in no way does it foreclose a court from
evaluating the reasonableness of the FBI's judgments.

Id. at 875.

The Second Circuit then addressed whether courts could

be required to apply a conclusive presumption (absent bad

faith) to the FBI certification:

While the court will normally defer to the
Government's considered assessment of why disclosure
in a particular case may result in an enumerated harm
related to such grave matters as international
terrorism or clandestine intelligence activities, it
cannot, consistent with strict scrutiny standards,
uphold a nondisclosure requirement on a conclusory
assurance that such a likelihood exists.

Id. at 881. Instead, the Government must "at least indicate

the nature of the apprehended harm and provide a court with

some basis to assure itself . . . that the link between

disclosure and the risk of harm is substantial." Id. at 881

(emphasis added).

Finally, as to the third requirement, the Second

Circuit stated that the statutorily enumerated harms are

necessarily "keyed to the same standard that governs

information sought by an NSL, i.e., relevant to an

authorized investigation to protect against international

- 13 -

terrorism or clandestine intelligence activities." Id. at 875.

The sections of the USA FREEDOM Act amending Sections 2709 and 3511 incorporate portions of Mukasey's holding and reasoning. As in earlier versions of the statute, under Section 2709, the government may require non-disclosure for four statutorily enumerated reasons, with certification from an FBI official: if disclosure could implicate (1) a danger to the national security of the United States; (2) interference with a criminal, counterterrorism, or counterintelligence investigation; (3) interference with diplomatic relations; or (4) danger to the life or physical safety of any person. 18 U.S.C. § 2709(c)(1)(B). However, Section 2709 now also provides that an NSL or a nondisclosure requirement accompanying an NSL is subject to judicial review under Section 3511, and that an NSL must include notice of the availability of judicial review. 18 U.S.C. § 2709(d).

Most relevant to the issue at hand, the USA FREEDOM Act made significant changes to Section 3511, the statutory provision governing judicial review of NSLs. The current version of Section 3511 includes a "reciprocal notice procedure" (see Mukasey, 549 F.3d at 879) providing for

- 14 -

government-initiated review of a non-disclosure requirement after notice by the recipient of intent to challenge the non-disclosure requirement. 18 U.S.C. § 3511(b)(1)(A). And no longer does Section 3511 state that courts are to give a conclusive presumption, absent bad faith, to the official's certification. Now, under Section 3511:

> **Standard.** -- A district court of the United States shall issue a nondisclosure order . . . if the court determines that there is reason to believe that disclosure of the information subject to the nondisclosure requirement during the applicable time period may result in –
>
> (A) a danger to the national security of the United States;
> (B) interference with a criminal, counterterrorism, or counterintelligence investigation;
> (C) interference with diplomatic relations; or
> (D) danger to the life or physical safety of any person.

18 U.S.C. § 3511(b)(3).

The Court agrees with the Government that, at least as concerns the relevant statutory provisions for the case at hand, the amended Sections 2709 and 3511 codify the Mukasey standard for judicial review of a non-disclosure requirement -- i.e., that the Government has the burden to show that a good reason exists to expect that disclosure of receipt of an NSL will risk an enumerated harm.[7] Therefore,

---

[7] The Government argues that "[u]ltimately, the question under [the amended Section] 2709(c) and [Mukasey] is whether the government has

the Court will now turn to the application of the Mukasey standard, as reflected in Sections 2709 and 3511, to the portions of the Attachment that Merrill is currently prohibited from discussing publicly.

## B. APPLICATION TO THE ATTACHMENT

The Court now turns to whether the Government has satisfied its burden of showing a good reason exists to believe that disclosure of the Attachment could result in a statutorily enumerated harm related to an authorized ongoing investigation to protect against international terrorism or clandestine intelligence activities.

The Government argues that disclosure of the Attachment would reveal law enforcement techniques that the FBI has not acknowledged in the context of NSLs, would indicate the types of information the FBI deems important for investigative purposes, and could lead to potential targets of investigations changing their behavior to evade law enforcement detection. (See Gov't Mem. at 6.) The Court agrees that such reasons could, in some circumstances, constitute "good" reasons for disclosure. As the Second Circuit stated in Mukasey, "it is obvious and unarguable

_____

met its burden of showing a 'good reason' to expect that disclosure will risk an enumerated harm, and 'some basis' to conclude that the disclosure is linked to the risk." (Gov't Reply Mem. at 8.)

that no governmental interest is more compelling than the security of the nation." 549 F.3d at 878 (quoting Haig v. Agee, 453 U.S. 380, 307 (1981)). Similarly, the Second Circuit has indicated that the government has a compelling interest in "combatting crime, corruption, and racketeering." Sanitation & Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 998 (2d Cir. 1997). Such interests parallel some of the Section 2709 enumerated harms -- i.e., whether disclosure could implicate a danger to the national security of the United States or interference with a criminal, counterterrorism, or counterintelligence investigation. However, as the Mukasey Court held, courts cannot, consistent with the First Amendment, simply accept the Government's assertions that disclosure would implicate and create a risk to these interests. The Government must still provide a court with "some basis to assure itself . . . that the link between disclosure and risk of harm is substantial." See Mukasey, 549 F.3d at 881 (emphasis added).

Here, the Government has not demonstrated a good reason to expect that public disclosure of the parts of the Attachment that remain confidential would risk one of these enumerated harms; nor has the Government provided the Court

- 17 -

with some basis to assure itself that the link between disclosure and risk of harm is substantial. The Government's justifications might constitute "good" reasons if the information contained in the Attachment that is still redacted were not, at least in substance even if not in the precise form, already disclosed by government divisions and agencies, and thus known to the public. Here, publicly-available government documents provide substantially similar information as that set forth in the Attachment. For that reason, the Court is not persuaded that it matters that these other documents were not disclosed by the FBI itself rather than by other government agencies, and that they would hold significant weight for a potential target of a national security investigation in ascertaining whether the FBI would gather such information through an NSL. The documents referred to were prepared and published by various government divisions discussing the FBI's authority to issue NSLs, the types of materials the FBI seeks, and how to draft NSL requests.

Indeed, one of these documents is a publicly-available Department of Justice Office of Legal Education manual that provides a sample attachment that encapsulates much of the redacted-information in the Attachment here in dispute. The

sample attachment included therein would authorize the FBI to request from a hypothetical NSL recipient:

(A)  The following customer or subscriber account information for each account registered to or associated with sample@sample.com for the time period [date range]:

   1. subscriber names, user names, screen names, or other identities;

   2. mailing addresses, residential addresses, business addresses, email addresses, and other contact information;

   3. local and long distance telephone connection records, or records of session times and durations;

   4. length of service (including start date) and types of service utilized;

   5. telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and

   6. means and source of payment for such service (including any credit card or bank account number) and billing records.

(B)  All records and other information relating to the account(s) and time period in Part A, including:

   1. records of user activity for any connections made to or from the account, including the date, time, length, and method of connections, data transfer volume, user name, and source and destination Internet Protocol address(es);

   2. telephone records, including caller identification records, cellular site and sector information, GPS data, and cellular network identifying information . . .

   3. non-content information associated with the contents of any communication or file stored by or for the

account(s) such as the source and destination email
addresses and IP addresses.

4. Correspondence and notes of records related to the
account(s).

(Manes Decl. Ex. L at 222-23.)

The information this sample attachment reveals is
substantially similar, in some instances identical, to the
material that the FBI argues should not be disclosed in the
Attachment. The Government contends that if the parts of
the Attachment that remain secret are disclosed, potential
targets could change their behavior to evade law
enforcement. But those targets can already learn, based on
publicly available information, that the FBI could obtain
such information through NSLs. The sample attachment
indicates that the FBI can seek account information
relating to "records of user activity for any connections"
including the "method of connections, data transfer volume,
user name, and source and destination Internet Protocol
address(es)." This is substantially similar to some of the
redacted categories of the Attachment at issue -- i.e.,
"DSL account information," and "Internet Protocol (IP)
address assigned to the account." Nor would it be a leap
for someone to determine that other redacted categories in
the Attachment -- i.e., "website information registered to

the account" and "Uniform resource locator (URL) address assigned to the account" -- might fall into the categories identified in the sample attachment. Likewise, the sample attachment requests the "length of service (including start date) [relating to an account]," which is substantially similarly to the currently-redacted category of the "[d]ate the account opened or closed."

Merrill also points to a 2002 letter from the Deputy Attorney General to Senator Patrick Leahy (the "Leahy Letter"), which was later reprinted as an appendix to a 2003 Senate Report. In that letter, the Deputy Attorney General states:

> NSLs can be served on Internet Service Providers to obtain information such as subscriber name, screen name or other on-line names, records identifying addresses of electronic mail sent to and from the account, records relating to merchandise orders/shipping information, and so on but not including message content and/or subject fields.

(See Manes Decl. Ex. J). Though this communication is now public information published in a Senate Report, see S. Rep. No. 108-40, 89-90 (2003), the Government nonetheless seeks to prevent Merrill from disclosing that the Attachment sought "Records relating to merchandise orders/shipping information for the last 180 days" as well as "Order forms." Since this information has already been

- 21 -

substantially disclosed in correspondence by the Justice
Department to Congress, as indicated by the Leahy Letter,
the Court is not persuaded that there is a substantial risk
that disclosure of substantially the same information in
the Attachment would lead future targets of investigations
to change their behavior to evade law enforcement to any
materially greater extent that they would from the
information they have already available in a publicly-
available Senate Report.[8]

Similarly, the Government claims there is a good
reason to prevent disclosure of the phrase "and related
subscriber information" in the category "Subscriber name
and related subscriber information." However, it is
generally known that the FBI can collect "subscriber
information" through NSLs; indeed, "subscriber information"
is expressly identified in Section 2709(a) in granting the
statutory authority for the issuance of NSLs. See 18 U.S.C.
§ 2709(a) ("A wire or electronic communication service

---

[8] The Court notes that the Leahy Letter does not reveal the "180 day"
time period in which the FBI sought order and shipping information from
Merrill. The Perdue Declaration argues that if this 180-day period is
revealed, then "potential terrorists" could manipulate orders to avoid
having those orders fall within the 180 day period. (Perdue Decl. ¶
64.) The Court is not persuaded. A "potential terrorist" does not know
when, if ever, the FBI will issue a related NSL. The 180-day period
clearly relates to the date Merrill received the NSL, and it is hard to
imagine any person outside of the FBI having the knowledge about when
an NSL might be issued, and changing their behavior as a result.

provider shall comply with a request for subscriber information. . ."); see also Manes Decl. Ex. I at 3-5 (Memorandum Opinion for the FBI's General Counsel Office that discusses, at length, the term "subscriber information").[9] Therefore, the Government has not provided a good reason to justify non-disclosure of the word "subscriber" and similar iterations of that word; Section 2709 and public government documents make clear that NSLs seek "subscriber information."

Perhaps realizing the tenuous connection of the disclosure of such information in the instant Attachment to enumerated harms, the Government, during the course of briefing its motions, conceded that non-disclosure was no longer needed for certain categories of records the FBI seeks -- in particular, the request for "Internet service provider (ISP)," "[a]ll e-mail addresses associated with [the] account," and "[s]creen names or other on-line names associated with the account." (See Gov't Mem. Attach.) That the Government conceded to disclosure of these categories only when, during the course of litigation, it was

---

[9] A publicly-available March 2007 Report from the Department of Justice Office of the Inspector General also indicated that the FBI can obtain through NSLs "[s]ubscriber information associated with particular telephone numbers or e-mail addresses, such as the name, address, length of service, and method of payment." (Manes Decl. Ex. K at 10.)

statutorily required to provide the FBI certification justifying non-disclosure, lends credence to Merrill's argument that, for years, the non-disclosure requirement enforced against him was overly broad and could not be supported by a "good reason."[10] (Compare Merrill Decl. Ex. C with Gov't Mem. Attach.)

Indeed, many of the remaining redactions in the Attachment are even harder to justify than the categories discussed thus far. For example, the Government seeks to prevent Merrill from disclosing that the Attachment requested "Subscriber day/evening telephone numbers" even though the Government now concedes that the phrase "telephone number" can be disclosed. The Court is not persuaded that there is a "good reason" to believe that disclosure of the fact that the Government can use NSLs to seek both day and evening telephone numbers could result in an enumerated harm, especially if it is already publicly known that the Government can use NSLs to obtain a telephone number, more generally.

---

[10] Also interestingly, the Perdue Declaration argues that the category of "[a]ny other information which [the recipient] consider[s] to be an electronic communication transactional record" should not be disclosed. (See Perdue Decl. ¶ 70.) However, this category was not redacted by the Government in its submissions or even in the Perdue Declaration.

As another example of the extreme and overly broad character of these redactions, the Government apparently believes that while the public can know that it seeks records of an "address" and a "telephone number," there is a "good reason" to prevent disclosure of the fact that the Government can seek "addresses" and "telephone numbers." (See Gov't Mem. Attach.) In any event, based on the Government's redactions alone, a potential target of an investigation, even a dim-witted one, would almost certainly be able to determine, simply by running through the alphabet, that "telephone number■" could only be "telephone numbers." Redactions that defy common sense -- such as concealing a single letter at the end of a word -- diminish the force of the Government's claim to "good reason" to keep information under seal, and undermine its argument that disclosure of the currently-redacted information in the Attachment can be linked to a substantial risk of an enumerated harm.

As a third example, the Government seeks to prevent disclosure of the phrases "related to account" and "associated with the account" for certain categories of records sought, even though the Government has acknowledged that there is no need for non-disclosure of the main

information the NSL sought to collect -- i.e., information related to an "address" and "billing." The Court is not persuaded that there is a good reason for non-disclosure of the fact that these requests were keyed to a particular account; obviously, the Government uses NSLs to obtain information related to a particular subscriber or account. (See, e.g., Manes Decl. Ex. I at 5 (Memorandum Opinion for the FBI's General Counsel Office discussing "local and long distance toll billing records" that could be attributed to "a particular account.")[11]

Additionally, the Government seeks to keep some information redacted despite publicly conceding that those types of records (i.e., "radius log" information, which is cell-tower based phone tracking information) are no longer sought through NSLs. Yet the Government still argues that this information should remain redacted because it would reveal techniques that might be used at some undetermined time under a hypothetical policy promulgated by a future administration. (See Perdue Decl. ¶ 59.) This reason is not a "good" reason; neither is the link between disclosure and

---

[11] Similarly, the publicly-available March 2007 Report from the Department of Justice Office of the Inspector General indicated that electronic communication transactional records include "e-mail addresses associated with the account; screen names; and billing records and method of payment."[11] (Manes Decl. Ex. K at 10.)

the risk of harm "substantial." Furthermore, as Merrill argues, it is "no secret" that the FBI can access radius log information, and the other information identified in the Attachment through means other NSLs. (See Pl. Mem. at 19; Pl. Reply Mem. at 11, 21-22.)

Therefore, the Court finds that the Government has not demonstrated a good reason to believe that potential targets of national security investigations will change their behavior to evade detection, or that disclosure of the Attachment in its entirety would create a substantial risk of one of the statutorily enumerated harms.

The Court's ruling here is consistent with the Court's prior decisions relating to the NSL issued to Merrill. First, the present challenge can be factually distinguished from Doe III and Doe IV. In Doe III, this Court found that the Government had carried its burden of showing a good reason to keep the entire NSL letter and Attachment, including the identity of the recipient and target, confidential. In Doe IV, while the investigation remained ongoing, the Court found that specific information in the Attachment could be disclosed: both material within the scope of information that the NSL statute identifies as permissible for the FBI to obtain through the use of NSLs,

- 27 -

and material that the FBI has publicly acknowledged it has previously requested by means of NSLs. <u>See</u> 703 F. Supp. 2d at 316.

Since then, the Government's investigation has been closed, and the parties have reached agreement that Merrill can identify himself as the 2004 NSL recipient and disclose the identity of the target. Now, unlike earlier iterations of this litigation, the asserted Government interest in keeping the Attachment confidential is based solely on protecting law enforcement sensitive information that is relevant to <u>future</u> or <u>potential</u> national security investigations. The Government argues that, in <u>Doe IV</u>, the Court found such a justification to constitute a "good reason." (Gov't Reply Mem. at 8 n. 6.) However, the Court did not make such a broad statement there. In <u>Doe IV</u>, the Court found that "the Government has demonstrated a reasonable likelihood that disclosure of the Attachment in its entirety could inform current targets of law enforcement investigations, including the particular target of the Government's ongoing inquiry in this action, as well as, potentially, future targets." 703 F. Supp. 2d at 317. The Government claims that the term "future targets" were "obviously, not the subjects of an 'ongoing' underlying

investigation." (Gov't Reply Mem. at 8 n. 6.) On that point, the Government assumes too much. The "future targets" referred to in Doe IV were, more accurately, limited to future targets of that same investigation, which was not yet closed or publicly known.[12]

In any event, as discussed supra, circumstances have changed since Merrill's receipt of the NSL -- the investigation has closed, the Government no longer prohibits disclosure of Merrill's identity or the investigation's target, and many, if not all, of the redacted investigative techniques at issue here have been disclosed by other government agencies. Therefore, it strains credulity that future targets of other investigations would change their behavior in light of the currently-redacted information, when those targets (which, according to the Government, include "sophisticated foreign adversaries," see Perdue Decl. ¶ 56) have access to much of

---

[12] The Court is not holding that there are no circumstances in which the Government might be able to provide a "good reason" for non-disclosure, even when that reason is keyed to authorized investigations to protect against international terrorism or clandestine intelligence activities, generally, rather than to a particular ongoing investigation. Instead, based on the facts and submissions before it, the Government has not satisfied its burden that there is a good reason to expect that disclosure here -- with these particular factual circumstances -- raises a substantial risk that any of the statutorily enumerated harms would occur.

this same information from other government divisions and agencies.

Relatedly, the case at hand can be distinguished from case law cited by the Government (see Gov't Reply Mem. at 11-12) for the proposition that information need only be disclosed if the specific agency had made an official disclosure of the protected information. See, e.g., Wilson v. CIA, 586 F.3d 171 (2d Cir. 2009). Those cases either involve Freedom of Information Act ("FOIA") requests of classified government information, or issues related to disclosure of classified information by current or former government officials who were under a contractual obligation to keep classified information confidential. At issue here, however, is law enforcement sensitive material -- not classified information. The Government's justifications for keeping the Attachment confidential implicate classified information contained in the ex parte, in camera Perdue Declaration. However, Merrill is not seeking disclosure of the material contained therein. He seeks disclosure only of the Attachment, which is not classified.

Furthermore, the plaintiff here is a private citizen, not a government official who had a contractual obligation

to keep information confidential. As such, there are
significant reasons for treating the material at hand
differently from classified information that is normally
accessible only to individuals with security clearance. A
private citizen should be able to disclose information that
has already been publicly disclosed by _any_ government
agency -- at least once the underlying investigation has
concluded and there is no reason for the identities of the
recipient and target to remain secret. Otherwise, it would
lead to the result that citizens who have _not_ received such
an NSL request can speak about information that is _publicly_
_known_ (and acknowledged by other agencies), but the very
individuals who have received such NSL requests and are
thus best suited to inform public discussion on the topic
could not. Such a result would lead to "unending secrecy of
actions taken by government officials" if private citizens
actually affected by publicly known law enforcement
techniques could not discuss them. See Doe v. Gonzales, 449
F.3d 415, 422 (2d Cir. 2006) (Cardamone, J., concurring).

If the Court were to find instead that the Government
has met its burden of showing a good reason for non-
disclosure here, could Merrill _ever_ overcome such a
showing? Under the Government's reasoning, the Court sees

only two such hypothetical circumstances in which Merrill could prevail: a world in which no threat of terrorism exists, or a world in which the FBI, acting on its own accord and its own time, decides to disclose the contents of the Attachment. Such a result implicates serious issues, both with respect to the First Amendment and accountability of the government to the people.[13] As Judge Cardamone warned in his concurrence in <u>Doe v. Gonzales</u>, "a ban on speech and a shroud of secrecy in perpetuity are antithetical to democratic concepts and do not fit comfortably with the fundamental rights guaranteed American citizens," and such unending secrecy could "serve as a cover for possible official misconduct and/or incompetence." 449 F.3d at 422.

Because the Court finds that the Government has not shown a good reason for continued non-disclosure of the Attachment, pursuant to Section 3511, the Court need not (and should not) consider Merrill's other arguments that continued non-disclosure here constitutes a violation of his First Amendment rights and that the Government has exceeded its statutory authority for non-disclosure in the

---

[13] Such unending secrecy is also at odds with President Obama's 2014 remarks, in which he directed the Attorney General to limit the duration of NSL gag orders. (<u>See</u> Manes Decl. Ex. S.)

instant case.[14] See <u>Kreisberg v. HealthBridge Mgmt., LLC</u>, 732 F.3d 131, 138 (2d Cir. 2013) ("When, as here, a case may be resolved on other grounds, courts may decline to reach a constitutional question to 'avoid deciding constitutional issues needlessly.'").

### III. <u>STAY OF JUDGMENT</u>

As the Court did in <u>Doe I</u> and <u>Doe II</u>, in light of the implications of its ruling and the importance of the issues involved, the Court will stay enforcement of its judgment pending appeal, or for the Government to otherwise pursue any alternate course of action, for 90 days. The stay is intended to give the Government the opportunity to move this Court, or the Court of Appeals for whatever appropriate relief it may seek to maintain the confidentiality of any information implicated by the Court's ruling.

For those same reasons, portions of the Court's opinion -- those sections revealing the contents of the Attachment -- are redacted in the public filing of this Decision and Order, in order to preserve the Government's opportunities for further appellate review of this Decision

---

[14] As a result, the Court need not reach whether strict scrutiny applies to Merrill's claims. The Second Circuit found the procedural safeguards applied here are required under either strict scrutiny or a less exacting scrutiny. See <u>Mukasey</u>, 549 F.3d at 879, 882.

and Order requiring disclosure of the Attachment. In the event that this ruling requiring disclosure of the Attachment is not altered in the course of any further appellate review, an unredacted version of this opinion will be filed. See New York Times Co. v. U.S. Dep't of Justice, 752 F.3d 123, 123 n.1 (2d Cir. 2014).

## IV.  ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion for summary judgment (Dkt. No. 16) of Plaintiff Nicholas Merrill is **GRANTED**; and it is further

**ORDERED** that the motion to dismiss the Complaint or for summary judgment (Dkt. No. 24) of the Government is **DENIED**; and it is further

**ORDERED** that the Clerk of Court shall file the redacted version of this Decision and Order on the public docket; and it is further

**ORDERED** that the Clerk of Court shall enter judgment accordingly but stay enforcement of the judgment pending any appeal, or, if no appeal is filed, for 90 days from the date of this Decision and Order.

The Clerk of Court is directed to terminate the motion for summary judgment (Dkt. No. 16) and the motion to dismiss or for summary judgment (Dkt. No. 24), and to close this case.

**SO ORDERED.**

Dated:   New York, New York
         28 August 2015

                                        Victor Marrero
                                          U.S.D.J.

- 35 -